Argued and submitted June 14, order affirmed September 29, reconsideration denied October 27, 1994

# DON'T WASTE OREGON COMMITTEE
## and Lloyd K. Marbet,
### *Petitioners,*

*v.*

# ENERGY FACILITY SITING COUNCIL,
## Public Utility Commission,
## Hermiston Generating Company,
## City of Hermiston, and Hermiston 2000,
### *Respondents.*

## (SC S41175)

881 P2d 119

134

Daniel W. Meek, Portland, argued the cause and filed the petition and reply brief for petitioners.

John T. Bagg, Assistant Attorney General, Salem, argued the cause for respondents Energy Facility Siting Council and Public Utility Commission. With him on the response were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Jacob Tanzer, of Ball, Janik & Novack, Portland, argued the cause for respondent Hermiston Generating Company. With him on the response was Richard M. Whitman.

Rustin Brewer, Hermiston, waived appearance for respondent City of Hermiston.

Daniel Hill, Hermiston, waived appearance for respondent Hermiston 2000.

Barbee B. Lyon, of Tonkon, Torp, Galen, Marmaduke & Booth, Portland, filed a brief on behalf of *amicus curiae* Portland General Electric Co.

GRABER, J.

Fadeley, J., dissented and filed an opinion.

Unis, J., dissented and filed an opinion in which Fadeley, J., joined.

**GRABER, J.**

This case is before us on review from a Final Order of the Energy Facility Siting Council (EFSC), certifying a proposed natural gas facility near Hermiston to generate electricity.[1] For the reasons that follow, we affirm EFSC's Final Order.

## PROCEDURAL, LEGISLATIVE, AND REGULATORY BACKGROUND

Petitioners challenge the validity of OAR 345-23-010(2), the rule under which EFSC was considering the site certification, in three ways:

> "Number one, [the rule] is inconsistent with the energy policy expressed in ORS, Chapter 469. Two, Senate Bill 1016 of 1993 does not authorize the Energy Facility Siting Council to adopt such a rule. And three, such a rule was adopted without compliance with applicable rule-making procedures."[2]

In order to address the specific challenges that petitioners raise, we start with a brief description of the legislative and regulatory context, which will be explored more fully later in the opinion.

ORS 469.510 (1991) pertinently required that EFSC "shall set standards and promulgate rules" for the siting of energy facilities; subsection (5) directed that the standards and rules "shall take into account" present and future needs for power. In October 1992, EFSC adopted OAR 345-23-020, which provides standards under which applicants must demonstrate a need for the power from the proposed facility. At the same time, EFSC also adopted OAR 345-23-010, which exempts applicants for specified megawatt levels of power from having to demonstrate compliance with the need-for-power standard stated at OAR 345-23-020. The October 1992 rules were adopted after public hearing, with EFSC having

---

[1] ORS 469.403(3) requires this court to exercise direct review of challenges to such orders. The types of errors alleged by petitioners are reviewable pursuant to the standards of review for administrative actions set forth in the Oregon Administrative Procedures Act (APA). ORS 469.403(5); ORS 183.482.

[2] At the hearing, petitioners' counsel withdrew all other issues and stipulated that the three issues quoted in the text were the only remaining ones.

before it data on resource needs, and provided with respect to the type of natural gas facilities at issue here:

"Natural gas fired facilities with a fuel chargeable to power heat ratio of 8000 Btu/kWh or less shall be exempt from the requirement to demonstrate need if all but 20 percent of the capacity will be used by energy suppliers operating in the Pacific Northwest Region as defined in 16 U.S.C. 839a.(14), unless the capacity of natural gas fired facilities for which applications are pending before the Council, including the proposed facility, plus extant site certificates for natural gas fired facilities exceeds 950 megawatts at the time the application is filed." OAR 345-23-010(2) (1992).

Two applications for new natural gas facilities, each within the definition of facilities covered by OAR 345-23-010(2), were complete as of June 11, 1993. One was for the facility near Hermiston involved in this proceeding, with an output power capacity of 474 megawatts. The other was for a plant in Boardman, with an output power capacity of 462 megawatts. The two applications totaled 936 megawatts of output power capacity. No other applications for natural gas facilities, within the definition of facilities covered by OAR 345-23-010(2), were complete.

The 1993 Legislative Assembly enacted Senate Bill 1016, effective August 2, 1993. Or Laws 1993, ch 569. That law replaced ORS 469.510 (1991), among other provisions. ORS 469.501(1) (which is § 22 of SB 1016), like its predecessor, ORS 469.510 (1991), provides that EFSC "shall adopt standards for the siting" of energy facilities and directs that the standards shall take into account, among other things, the need for the facility, consistent with state energy policy. (See *post*, 320 Or at 151, for a more complete statement of the text of ORS 469.501(1).) ORS 469.501(2) (which is also part of § 22 of SB 1016) provides:

"The [Energy Facility Siting Council] may adopt exemptions, except for coal or nuclear power plants, from any need standard adopted under subsection (1)(L) of this section if the exemption is consistent with the state's energy policy set forth in ORS 469.010, 469.190 and 469.310 and the council's consideration of the implementation of the strategy prepared under ORS 469.060 for reducing the emission of gases that contribute to global warming."

On August 13, 1993, 11 days after SB 1016 became law, EFSC adopted temporary rules that readopted many of its siting rules and amended others. The general need-for-power standard, set out in OAR 345-23-020, was amended in terms that reflected the need-for-power phrasing of the newly enacted ORS 469.501. The exemption from having to demonstrate need for power in applications for natural gas-fired facilities, stated in OAR 345-23-010(2), also was amended by the August 1993 temporary rule. That amendment to the October 1992 rule, with additions italicized and deletions in brackets, provided:

> "Natural gas fired facilities with a fuel chargeable to power heat ratio of 8000 Btu/kWh or less *for which applications have been determined to be complete under OAR 345-21-030 on or before August 13, 1993* shall be exempt from the requirement to demonstrate need if all but 20 percent of the capacity will be used by energy suppliers operating in the Pacific Northwest Region as defined in 16 U.S.C. 839a.(14)[, unless the capacity of natural gas fired facilities for which applications are pending before the Council, including the proposed facility, plus extant site certificates for natural gas fired facilities exceeds 950 megawatts at the time the application is filed]."

The August 1993 temporary rule had the practical effect of exempting the applications for the plant near Hermiston and the plant in Boardman from having to demonstrate a need for their power.

In December 1993, EFSC issued a notice of intended action, stating that it intended to adopt the temporary rules as permanent rules. A rulemaking hearing was held on January 18, 1994. The hearings officer then submitted a report to EFSC, and EFSC adopted the rules on January 25, 1994. The 1994 permanent rules are the same as the 1993 temporary rules.

On January 31, 1994, a contested case proceeding concerning the siting of the plant near Hermiston commenced. On March 11, 1994, EFSC issued a Final Order, granting the site certificate. Within the statutory 60-day period for bringing such a challenge, petitioners, who had

participated in the siting proceeding, filed their challenge to the order in this court.[3]

## THE STATEMENT OF FISCAL IMPACT

ORS 183.335(2)(b)(E) requires an agency promulgating a rule to include with its notice of intended action

"[a] statement of fiscal impact identifying state agencies, units of local government and the public which may be economically affected by the adoption, *amendment* or repeal *of the rule* and an estimate of that economic impact on state agencies, units of local government and the public. In considering the economic effect of the proposed action on the public, the agency shall utilize available information to project any significant economic effect of that action on businesses which shall include a cost of compliance effect on small businesses affected." (Emphasis added.)

■■ Petitioners first assert that the statement of fiscal impact that EFSC included, pursuant to ORS 183.335-(2)(b)(E), in its notice of intended rulemaking for the 1994 amendment is deficient and that the defect requires invalidation of the rule under which this application for a site certificate was approved. A materially deficient statement of fiscal impact that accompanies a notice of intended action in a rulemaking proceeding can result in the invalidation of the rule that ultimately is enacted. ORS 183.335(2)(b)(E); *Dika v. Dept. of Ins. and Finance*, 312 Or 106, 111, 817 P2d 287 (1991).

In this case, the proposed rule amended the 1992 rule. ORS 183.335(2)(b)(E) requires, therefore, that EFSC have included with its notice of intended action in the amendment process a statement of fiscal impact that (1) identifies persons and entities that may be economically affected by the amendment to the 1992 rule and (2) estimates the economic impact of the amendment to the 1992 rule on those persons and entities.

The statement of fiscal impact that EFSC included with its notice of intended action stated:

"Fiscal and Economic Impact: Permanent adoption of the temporary rules is expected to have no fiscal impact on most

---

[3] *See* ORS 469.403(3) (setting time limit).

applicants for energy facility site certificates. The proposed rules implement changes to EFSC jurisdiction as required by the new statute, clarify the requirement to show need for power for new energy facilities, and allow an exemption from the need standard for applicants whose applications were filed before August 13, 1993. The cost of preparing and reviewing applications for energy facilities site certificates is not expected to change significantly."

EFSC consistently has characterized the 1994 amendment to the 1992 rule as one that produces no substantive change in the need-for-power exemption in the rule. EFSC asserts that the 1992 rule determined that there was a need for at least 950 megawatts of power produced by natural gas and that the 1992 rule therefore exempted applications from having to demonstrate need unless and until 950 megawatts of power produced by natural gas existed or had been applied for or approved.

In August 1993, according to EFSC, the only two pending applications for natural gas facilities amounted to a total of 936 megawatts.[4] EFSC asserts that the August 1993 temporary rule and its 1994 permanent counterpart merely had the effect of changing the previous exemption of 950 megawatts to an exemption of 936 megawatts by limiting the exemption to the two pending applications. Such a change, EFSC asserts, could have no material fiscal impact. EFSC thereby justifies the 1994 statement of fiscal impact as a complete and accurate assessment of the fiscal effect of the change in the rule, including an accurate description of the change in the need-for-power exemption. EFSC asserts that ORS 183.335(2)(b)(E) requires no more than that.

As previously stated, ORS 183.335(2)(b)(E) requires EFSC, with its notice of intended action, to identify and state the fiscal impact of a proposed amendment to the preexisting rule. We agree with EFSC that, *if* the 1994 proposed rule amendment did no more than restate in other terms the preexisting 950-megawatt exemption for applications to demonstrate need for power, then the statement of fiscal impact was adequate.

---

[4] The parties do not dispute that there were only two applications; rather, as will be discussed, they dispute whether 936 megawatts is the correct number of megawatts to attribute to the total of the two applications.

Petitioners assert, however, that the 1994 amendment had the effect of increasing the level of the 1992 exemption, by grandparenting-in two applications for natural gas power generation that, together, exceed 950 megawatts. That contention hinges on petitioners' assertion that the 1992 rule exempted 950 megawatts of "nameplate" or "nominal" generating capacity and that the two applications here totaled 1,004 megawatts of nameplate capacity. EFSC's primary response is that the 1992 rule exempted 950 megawatts of "net" or "output" generating capacity and that the two applications here totaled 936 megawatts of output capacity.

For purposes of the discussion in this case, the generating plants at issue have two different ratings of generating capacity. One is the total generating capacity — the sum of the electricity that the plant can bring for sale to the power grid plus the electricity required to operate the plant — and is referred to as the nominal or nameplate capacity. The other rating consists solely of the power that the plant can bring for sale to the power grid, referred to as the plant's net capacity or output capacity.[5] In this instance, the total nameplate capacity of the two proposed plants is 1,004 megawatts, and their total output capacity is 936 megawatts.

The threshold legal inquiry is whether the 1992 rule exempted 950 megawatts of nameplate capacity or 950 megawatts of output capacity. If the 1992 rule exempted 950 megawatts of nameplate capacity, then the 1994 amendment effectively raised the need-for-power exemption for natural gas-fired facilities to 1,004 megawatts of nameplate capacity.

Our review in this case is to determine whether EFSC "has erroneously interpreted a provision of law," pursuant to ORS 183.482(8)(a), made applicable to this proceeding by ORS 469.403(6). We hold that EFSC did not erroneously conclude that the 1992 rule exempted 950 megawatts of output capacity and that the 1994 amendment did not, therefore, raise the level of the 1992 exemption.[6]

---

[5] The statutory and regulatory provisions defining those two different capacity ratings are discussed in text *post*, 320 Or at 141.

[6] Accordingly, we need not and do not consider whether the statement of fiscal impact would have been sufficient if the 1994 amendment had changed the exemption limit from 950 megawatts of nameplate capacity to 1,004 megawatts of nameplate capacity.

The 1992 rule pertinently exempted applications for certain defined natural gas-fired facilities[7] from having to demonstrate need for power

"unless the *capacity* of natural gas fired facilities for which applications are pending before the Council, including the proposed facility, plus extant site certificates for natural gas fired facilities *exceeds 950 megawatts* at the time the application is filed." OAR 345-23-010(2) (emphasis added).

The emphasized text, which does not refer expressly either to nameplate capacity or to output capacity, but rather only to "capacity," is the text at issue.

The statutes and rules defining nominal and nameplate capacity are definitional only and are worded to have no independent substantive effect. ORS 469.020(10), ORS 469.300(15), OAR 345-01-010(15) and (17), OAR 345-01-100(1). Similarly, the rule that defines the term "net electric output," OAR 345-23-000(4) (meaning "the electric energy or capacity made available for use excluding electricity used in the production of electrical energy"), is definitional only and also is worded to have no independent substantive effect. As a result, those rules and statutes do not expressly inform us what EFSC meant in 1992 when it used the unmodified term megawatt "capacity" — without either of the descriptive qualifiers, "nominal" or "output" — to set the level of the natural gas need-for-power exemption.

Instead, the text of the 1992 rule setting a need-for-power exemption in terms of a "capacity" of 950 megawatts, read in its context, plausibly could mean either "nominal capacity" or "output capacity." Moreover, the statute pursuant to which EFSC adopted the 1992 rule permitted either meaning. Petitioners do *not* argue that the statute pursuant to which EFSC adopted the 1992 rule *required* that the level of a natural gas need-for-power exemption be expressed in terms of nominal capacity, as distinct from output capacity. That statute, ORS 469.510 (1991), required EFSC to adopt standards and promulgate rules for siting energy facilities, including the type of facility at issue in this case. Subsection (5) of that statute also directed that the standards and rules

---

[7] The definition of the facilities covered by the exemption did not change in the 1994 amendment to the rule.

"shall take into account * * * [p]resent and future industrial, commercial and residential power needs by classes and amount for each class." Indeed, a standard that takes into account the needs of users of power corresponds more logically to output capacity, which represents an energy generating facility's ability to deliver power to those whose needs may be served.

We have concluded thus far that the express provisions of the 1992 rule, read in context, permit either meaning of "capacity" in the 1992 rule and that either reading is consonant with the enabling legislation. EFSC interpreted the 1992 rule to refer to output capacity.

The question thus becomes: When an agency's interpretation of its own rule is consistent with the wording of that rule, considered in its context, and when no other source of law establishes that the agency's interpretation of the rule is impermissible, what is the result of judicial review of that interpretation of the agency's rule under ORS 183.482(8)(a)?

■ As noted, this court is authorized to overrule an agency's interpretation of a rule if an agency has "erroneously interpreted a provision of law." ORS 183.482(8)(a). In this case, the "provision of law" is the rule itself. Where, as here, the agency's plausible interpretation of its own rule cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law, there is no basis on which this court can assert that the rule has been interpreted "erroneously." It follows that, in circumstances like those presented here, this court cannot overrule, under ORS 183.482(8)(a), an agency's interpretation of its own rule.[8]

In this case, EFSC has taken the position that the 1992 rule refers to 950 megawatts of *output* capacity. EFSC has not only argued that to this court, but that interpretation

---

[8] For a similar conclusion in the land use context, reached by a slightly different methodology, *see Clark v. Jackson County*, 313 Or 508, 515, 836 P2d 710 (1992) (holding that a local government policy-making body's interpretation of its own land use regulation must be affirmed, if that interpretation is consistent with the wording of the regulation and not inconsistent with some other provision of law); *Gage v. City of Portland*, 319 Or 308, 877 P2d 1187 (1994) (holding that no such deference is owed to an interpretation of a local land use regulation when the person interpreting the regulation was not the one who promulgated it).

was the foundation of EFSC's statement of fiscal impact and the order granting the site certificate. From the first time that it confronted the question by issuing the temporary rule in August 1993 (only 10 months after promulgating the 1992 rule), EFSC has held to the view that the two pending, completed applications exhausted almost all, but not more than, the 950 megawatts of generating capacity exempted from a need-for-power showing under EFSC's own 1992 rule.[9] Observers and participants in the rulemaking process have not been misled, because the ambiguity about the meaning of the term "capacity" in the 1992 rule has always been present, in the proposed rule as well as the adopted rule.

To summarize: The text of the 1992 rule setting a need-for-power exemption in terms of a "capacity" of 950 megawatts, read in context, plausibly could mean either nominal capacity or output capacity. EFSC's interpretation of its own rule is not inconsistent with the express provisions of the rule, read in its context, or with the rule's apparent purpose or policy. EFSC's interpretation also does not place the rule in conflict with a statute.

Applying the pertinent standard of review, ORS 183.482(8)(a), we conclude that EFSC's interpretation of the term "capacity" in the 1992 rule — that it refers to output capacity rather than nominal capacity — is a permissible interpretation of the rule and, therefore, is not erroneous.

Petitioners also make a number of other arguments about the alleged deficiency of the statement of fiscal impact. For example, they contend that the statement failed to examine the impact of the need-for-power exemption on the public or on business and that the statement did not acknowledge changes wrought by SB 1016 in July 1993 in the categories of

---

[9] The Final Order states:

"The 1992 rule was substantially the same as the need exemption rule adopted on January 24, 1994. * * *

"* * * * *

"In addition, the question of fiscal impact implies some change. The rule involved here has been in place essentially unchanged since 1992. The fiscal impact statement accompanied a proposed 1994 rule that merely limited the need exemption rule in place since 1992. The decision on the 1994 rule did not result in any material change to the fiscal impact of the rule."

natural gas-fired facilities exempt from EFSC scrutiny under the need-for-power standard.

As discussed above, the effect of the 1994 amendment of the 1992 rule, with respect to the need-for-power exemption, was simply to modify the exemption limit for certain defined natural gas facilities, in effect, from 950 megawatts to 936 megawatts, in the form of the two pending, complete applications. The statement of fiscal impact related to that change is, therefore, sufficient with respect to the 1994 amendment to the rule. Petitioners' various arguments pertain to the overall effect of the *entire* rule or to the effect of SB 1016. Accordingly, petitioners identify items that the statement of fiscal impact for the 1994 amendment was not required to address.

## EFSC'S ADVISORY GROUP STATEMENT

■ Petitioners next assert that EFSC was statutorily required to appoint an advisory committee in making the 1994 rule and that EFSC's explanation of its decision not to do so was defective. Petitioners assert that those defects in procedure require reversal of EFSC's order.

ORS 183.025(2) was enacted in 1993. Consistent with its declaration of policy that "whenever possible the public be involved in the development of public policies by agencies and the drafting of rules," the statute provides:

> "The Legislative Assembly encourages agencies to seek public input to the maximum extent possible before giving notice of intent to adopt, amend or repeal a rule. The agency may appoint an advisory committee that will represent the interests of persons likely to be affected by the rule, or use any other means of obtaining public views that will assist the agency in drafting the rule."

EFSC was not required by ORS 183.025(2) to appoint an advisory committee. The statute provides that an agency "may" appoint such a committee or may instead "use any other means of obtaining public views." In this instance, EFSC did not appoint an advisory committee with respect to the 1994 amendments to the 1992 rule. EFSC gave notice of the 1994 rulemaking and held a hearing at which the public could appear or submit written comments. Petitioners

appeared at that hearing. EFSC used sufficient "other means of obtaining public views." ORS 183.025(2).

■ In addition, ORS 183.335(2)(b)(F) provides:

"If an advisory committee is not appointed under the provisions of ORS 183.025(2), [the notice of intended rulemaking action shall include] an explanation as to why no advisory committee was used to assist the agency in drafting the rule."

EFSC's notice in this case stated: "As there are no policy or technical issues to be resolved in this rulemaking, EFSC does not believe it would be useful to appoint an advisory committee." EFSC provided the statutorily required "explanation" for its decision not to appoint an advisory committee. No more is required by the law in this instance.

Petitioners' specific assertions relating to those statutes are not well taken.

### THE ROLE OF THE HEARINGS OFFICER AT THE RULEMAKING

At the rulemaking hearing, the Oregon Department of Energy (ODOE) advocated the proposed amendment to the rule in testimony by Carver, an employee of ODOE. The hearings officer for the rulemaking hearing was also an ODOE employee, Grainey. Petitioners assert that those roles of ODOE employees constitute a "defect" in the proceeding, compounded by the fact that Grainey submitted written recommendations to EFSC and that Grainey assertedly did not convey to EFSC the written testimony of petitioners before EFSC adopted the amendment. Petitioners do not assert that Grainey harbored actual bias.

■ With the exception of the specific claim as to the effect of the alleged failure to convey the written testimony of petitioners to EFSC, petitioners cite — and we are aware of — no rule, statute, constitutional provision, or principle articulated in decisional law for their claim that EFSC cannot appoint an ODOE employee to act as a hearings officer in a rulemaking if another ODOE employee testifies at the rulemaking hearing.

■ We turn, then, to consider petitioners' remaining assertion, that the hearings officer was required to convey to

EFSC their entire written testimony verbatim in the rulemaking to satisfy the statutory mandate that "[t]he agency shall consider fully any written or oral submission." ORS 183.335(3)(a). In this instance, EFSC appointed a hearings officer to conduct the rulemaking. The hearings officer had, and considered fully, petitioners' verbatim testimony. The hearings officer, consistent with the procedural rules for the rulemaking (OAR 137-01-030(1), OAR 137-01-040(2)), provided a written report and recommendation to EFSC that included a summary of petitioners' testimony. The hearings officer again summarized that testimony orally to EFSC in a conference call attended by petitioners.

■ By requiring an agency to "consider fully any written or oral submission" in a rulemaking, ORS 183.335(3)(a) does not thereby preclude an agency from appointing a hearings officer to conduct the rulemaking proceeding for the agency and to summarize the record of the rulemaking for the agency to consider when making its decision. Indeed, petitioners do not challenge the statutory or regulatory authority of an agency to appoint a hearings officer to conduct a rulemaking hearing and to make a report and recommendation to the agency.

■ "Full" agency consideration of a submission does not require — by its terms or by necessary implication — that the original submission, whether written or oral, actually be in front of the agency itself when it makes its decision. The agency certainly *may* look to the submissions in their original form if the agency deems it necessary to ensure that the submissions have been "consider[ed] fully," *e.g.*, if the agency is not satisfied with its hearings officer's summary, or if the agency deems the nature of the testimony to be particularly important and wants more than a summary of it, or if a party calls into question the accuracy of the summary and the question of accuracy requires resolution. But the statute does not *require* that all the original testimonial submissions physically be included in the record before the agency when it makes its decision.

It bears further note that, even if the statute requiring "full consideration" were deemed to require physical conveyance of all testimonial submissions, the same statute requires only "substantial compliance" with its provisions.

ORS 183.335(10)(a). Neither during the rulemaking hearing nor in their post-hearing brief in the contested case proceeding did petitioners assert that the hearings officer failed to consider fully their testimony or that the hearings officer failed to summarize their testimony accurately in his written and oral reports to EFSC.[10] Under those circumstances, even if petitioners were correct with respect to the requirements of the law, they cannot establish that the procedure employed by EFSC failed to comply substantially with the requirement that the agency fully consider petitioners' submissions.

It is sufficient, for purposes of the challenge based on ORS 183.335(3)(a) in this case, that the hearings officer appointed by EFSC "consider[ed] fully" petitioners' submissions in their original form and that the hearings officer's reports summarized that testimony for EFSC to consider. The rulemaking was not invalid for failure to comply with ORS 183.335(3)(a) in the manner argued by petitioners.

## THE VALIDITY OF THE REGULATORY NEED EXEMPTION

A. *The rule exemption is authorized by statute.*

Petitioners assert that the need-for-power exemption for *plants* with a fuel chargeable to power heat rate of less than *8000* BTU per kilowatt hour, stated in OAR 345-23-010(2), is inconsistent with ORS 469.320(2)(c) and, therefore, is invalid. ORS 469.320(2)(c) exempts *cogeneration* facilities with a fuel chargeable to power heat rate of not greater than *6000* BTU per kilowatt hour from the site certificate process in its entirety.

---

[10] Petitioners' opening brief in this court asserts that the written and oral summary of their testimony was inaccurate. The summaries state that petitioners testified that there is no need for natural gas facilities to meet regional load and that the load can be met through energy conservation and renewable resource alternatives. Petitioners assert that the described summary is inaccurate, because their testimony also "included extensive discussion of the alternatives of efficient gas-fired cogeneration facilities (below 6000 Btu/kWh produced) and direct use of natural gas for space and water heating."

In view of the limited nature of the proposed 1994 amendment to the 1992 rule, which was (in effect) simply to restate the preexisting natural gas exemption limit in different terms, it is not immediately apparent how the asserted inaccuracy, if it is an inaccuracy, is relevant.

By contrast with the need-for-power exemption of OAR 345-23-010(2), ORS 469.320(2)(c) provides a different exemption (an exemption from the entire site certificate process) for a different type facility (a cogeneration facility) with a different efficiency rating (6000 BTU/kwh). ORS 469.501 requires EFSC to consider need for power in siting and authorizes EFSC to adopt need-for-power exemptions. There is nothing express or implicit in ORS 469.320(2)(c) that would preclude EFSC from adopting a need-for-power exemption for natural gas facilities of 8000 BTU/kwh or less, pursuant to ORS 469.501. Petitioners seek to have an exemption for apples preclude an exemption for oranges.

B. *EFSC was not required to adopt the need-for-power exemption in a contested case proceeding.*

Petitioners assert that EFSC was required to adopt the need-for-power exemption in a contested case proceeding rather than by rule. That contention hinges on the assertion that EFSC was required to adjudicate by "order," rather than legislate by "rule," the need-for-power exemption, because only two identifiable applicants were affected by the amended rule.

ORS 183.310, a part of the APA, defines "order" and "rule":

"(5)(a) 'Order' means any agency action expressed orally or in writing directed to a named person or named persons, other than employees, officers or members of an agency. 'Order' includes any agency determination or decision issued in connection with a contested case proceeding. * * *

"* * * * *

"(8) 'Rule' means any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency."

*See also Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.*, 287 Or 591, 602-03, 601 P2d 769 (1979) (in determining whether a quasi-judicial adjudication is required, one "presupposes that [an adjudicatory] process is bound to result in a decision and that the decision is bound to apply

preexisting criteria to concrete facts," with further consideration given to "whether the action, even when the governing criteria leave much room for policy discretion, is directed at a closely circumscribed factual situation or a relatively small number of persons").

The statutes pertinent here consistently have required that EFSC adopt standards for siting and that those standards shall take into account the need for power. ORS 469.510(5) (1991); ORS 469.501(1)(L). EFSC's original 1992 rule, exempting various levels of different generating sources from having to demonstrate need for power (including the natural gas exemption at issue here), was consistent with the statutory mandate of ORS 469.510 (1991) that EFSC consider need for power in siting and that EFSC "shall set standards and promulgate rules for the siting."

The need-for-power exemption for natural gas-fired facilities, first stated in 1992 and then restated in essentially the same terms in 1993 and 1994, constitutes a "standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy," that is, a "rule." ORS 183.310(8). The 1992 rule was not directed at an individual party and thus was not an "order." ORS 183.310(5). Similarly, under the criteria announced in *Strawberry Hill 4 Wheelers* for determining whether an agency action requires adjudication, the 1992 rule was *not* by its nature an *adjudicatory* action by the agency, wherein the agency was bound to apply preexisting criteria to a concrete set of facts and produce a decision.

EFSC amended and restated the 1992 rule, in essentially the same terms, in its rules promulgated in 1993 and 1994. Those amendments did not transform the rulemaking enterprise into an "order," requiring the trappings of an adjudication, merely because the amendments recognized that the two existing applications eligible for the exemption, in total, had all but exhausted the 950-megawatt exemption level set by the 1992 rule.

Whether one applies the APA definitions of "order" and "rule" or the guidelines for recognizing an adjudication pursuant to *Strawberry Hill 4 Wheelers*, one reaches the same conclusion. EFSC's regulatory decisions to adopt need-for-

power exemptions and to set various levels of those exemptions for different types of generation sources (including the exemptions for specific megawatts of natural gas-fired generating capacity), are characteristic exercises of rulemaking authority. *Cf. Forelaws on Board v. Energy Facility Siting Council*, 306 Or 205, 214, 760 P2d 212 (1988) (recognizing EFSC's broad authority to adopt rules for the siting of generating facilities and concluding that there is a "strong inference of legislative intent that the agency exercise its policymaking in rulemaking proceedings rather than in the course of deciding contested cases"); *Marbet v. Portland General Electric*, 277 Or 447, 462-63, 561 P2d 184 (1977) ("where the statute entrusts choices between alternate policies to [EFSC], its directive to adopt standards calls for agency articulation of these choices, and the procedures for public participation [in a rulemaking] take the place of the legislative forum"). Contrary to petitioners' assertions, the law does not require that the exemption-setting exercise undertaken by EFSC have been conducted in an adjudicatory or contested case proceeding.

C. *Petitioners did not preserve a claim that EFSC's rulemaking was not supported by substantial evidence or substantial reason.*

Petitioners' opening brief asserts that EFSC's rulemaking was not supported by substantial evidence or substantial reason. EFSC vigorously disputes that the 1994 rulemaking is subject to any such requirements.

EFSC additionally points out that petitioners' claims of error are not within those covered by petitioners' stipulation to the limited scope of their preserved challenges to the rule and the rulemaking,[11] and that petitioners fail to cite a place in the record demonstrating that they preserved the claims of error, in violation of ORAP 5.45.[12] Petitioners

---

[11] The terms of the stipulation are quoted in text *ante*, 320 Or at 135.

[12] ORAP 5.45(4) requires in part that an assignment of error must set out the pertinent portions of the record. ORAP 5.45(3) provides that "[a]n assignment of error that would require the court to search for the pertinent portion of the record in which the matter complained of appears shall not be considered." ORAP 5.45(2) provides in part that "[n]o matter assigned as error will be considered on appeal unless it was preserved in the lower court." ORAP 5.40(10) requires that an opening brief contain all matters necessary for decision, with reference to the record.

candidly acknowledge in their reply brief that their stipulation "appear[s] to preclude" the issues raised in this court related to lack of substantial evidence and substantial reason. We agree.

D. *The need-for-power exemption is not inconsistent with the mandates of the statutes relating to its adoption.*

ORS 469.501(1) directs EFSC to adopt standards for the siting of energy facilities and provides that the standards "shall take into account at least" 12 listed items. The final item in the list is paragraph (L), which is:

> "The need for the proposed facility, consistent with the state energy policy set forth in ORS 469.010, 469.190 and 469.310. In adopting the need standard, the council shall consider all of the costs of the emission from energy facilities of gases that contribute to global warming. The standard for need shall include but need not be limited to the following: [listing a number of items, including for example the treatment to be accorded proposed facilities similar to those identified in local energy plans]."

ORS 469.501(2) provides:

> "The council may adopt exemptions, except for coal or nuclear power plants, from any need standard adopted under subsection (1)(L) of this section if the exemption is consistent with the state's energy policy set forth in ORS 469.010, 469.190 and 469.310[13] and the council's consideration of the implementation of the strategy prepared under ORS 469.060 for reducing the emission of gases that contribute to global warming."

Thus, the need-for-power standard must take into account the state's energy policy and must consider the costs of emissions of gases that contribute to global warming. EFSC may also adopt exemptions from that need-for-power standard, if the exemption is consistent with the state's

---

[13] The "state's energy policy" under the three identified statutes is an amalgam of various goals, exhortations, declarations, and statements of policy both narrow (*e.g.*, policy to encourage conservation by providing tax relief to facilities that conserve energy resources or use renewable resources, ORS 469.190) and broad (*e.g.*, policy that siting of energy facilities "shall be accomplished in a manner consistent with the protection of the public health and safety and in compliance with the energy policy and air, water, solid waste, land use and other environmental policies of this state," ORS 469.310).

energy policy and EFSC's consideration of the implementation of the ODOE strategy for reducing the emission of gases that contribute to global warming.

Petitioners assert that the rule exempting the facility at issue here from the need-for-power standard is "inconsistent with the Oregon Legislature's energy policy, set forth in ORS Chapter 469." Although arising in the context of a contested case proceeding, this is *a challenge to the validity of the rule as adopted*, on the ground that it exceeds the agency's statutory authority. ORS 183.400(4)(b). In such a challenge to the validity of a rule, the court does not consider how the rule is being applied, nor does the court consider factual allegations that might affect the validity of the rule. *See AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992) (so holding). *See also* ORS 183.335(12) ("Unless otherwise provided by statute, the adoption, amendment or repeal of a rule by an agency need not be based upon or supported by an evidentiary record.").

There is no requirement in ORS chapter 469 or in ORS chapter 183 that a *rule* providing for a need-for-power exemption (or a need-for-power standard, for that matter) *on its face* recite the agency's underlying consideration of the state's energy policy or the effect on emissions of gases that cause global warming. The need-for-power exemption provided by OAR 345-23-010(2) is not "inconsistent" with any statutory requirement in this respect.

ORS chapter 469 does require, however, that EFSC, in setting a need-for-power standard and in adopting exemptions from that standard, actually have considered the state's energy policy, including "all of the costs of the emission from energy facilities of gases that contribute to global warming," ORS 469.501(1)(L), and "the implementation of the strategy prepared under ORS 469.060 for reducing the emission of gases that contribute to global warming," ORS 469.501(2). The record demonstrates that EFSC did so in promulgating OAR 345-23-010(2). EFSC's Final Order in the present case accurately summarizes that record as follows:

> "EFSC held a rulemaking hearing in which applicant, [petitioners] and ODOE submitted materials related to the emissions of $CO_2$, global warming, least cost plans, conservation and renewable resources, and the state's energy policy.

After the hearing, EFSC issued an order which adopted the need exemption rule. The order contained EFSC's findings of fact, reasoning and conclusions of law.

"In its findings, EFSC explained the way the 'need rule addresses these costs' of emission of gases that contribute to global warming. (Finding #2). EFSC then found that a benchmark of 'stabilizing $CO_2$ emissions at the 1990 level' has been adopted. (Finding #4). The need exemption rule is for 'unlimited amounts of high efficiency cogeneration and limited amounts of renewable resource and efficient * * * natural gas facilities,' and these 'facilities emit less $CO_2$ than new or existing coal or oil plants and existing natural gas plants.' (Finding #5). EFSC further found that 'the Northwest Power Planning Council's regional energy plan and Oregon utility's least cost plans filed with [the Public Utility Commission] indicated a need for approximately 950 megawatts of low cost natural gas resources in addition to energy conservation and renewable resources.' (Finding #8).

"In its conclusions of law, EFSC adopted 'the reasoning and conclusions of the hearing officer as expressed in his report of January 19, 1994.' (Concl. #1). As part of his reasoning, the hearing officer, in effect, explained the relationship between EFSC's findings of fact and the conclusions of law on the costs of emissions, the consistency of the exemption rule with the state's energy policy and consideration of the implementation of the strategy on global warming. (HO Rep. 2-7)." (Ellipsis in original.)

OAR 345-23-010(2), which sets a need-for-power exemption level for natural gas-fired facilities, is not *facially* inconsistent with ORS 469.501, which directs EFSC to adopt standards that take account of need for power and which authorizes EFSC to adopt exemptions from the need-for-power standard.

## CONCLUSION

We have considered and rejected each of the assignments of error advanced by petitioners. The Final Order of the Energy Facility Siting Council is affirmed.

The order is affirmed.

**FADELEY, J.,** dissenting.

The Oregon State Energy Facility Siting Council's (EFSC) order does not show that it complied with state law

when it granted the site certificate permit to build an air-polluting generation facility in this case.

The agency explains why it has chosen not to comply with the statutes rather than how it complied. That is, the agency offers an excuse for not complying. This excuse is quoted by the majority, 320 Or at 152-53, as proof of compliance with the statutes demonstrated in the agency order. Because only the excuse, not compliance, is present in this case, I dissent and would remand to the agency.

Oregon statutes require that the Oregon Department of Energy (ODOE) "shall transmit to the Governor and the Legislative Assembly a comprehensive plan" about energy generation. ORS 469.060(1). Under ORS 469.060(3),

"the plan * * * shall include, but not be limited to:

"* * * * *

"(e)  A strategy for reducing the emission of gases that contribute to global warming. The purpose of the strategy shall be to reduce these emissions by at least 20 percent below 1988 levels by 2005 * * *."

Thus, the Oregon legislature requires a 20 percent reduction in specified kinds of air pollution during the next decade. Before granting a certificate to permit construction of a new generation facility, EFSC must adopt a need standard under ORS 469.501. Subsection (1)(L) of that section, referred to as the basic rule, requires that:

"In adopting the need standard, the council *shall* consider all of the costs of the emission from energy facilities of gases that contribute to global warming." (Emphasis added.)

Even when granting an exemption from the need standard, EFSC still is statutorily required by ORS 469.501(2) to give "consideration of the *implementation*" of the 20 percent reduction in greenhouse gases mandated by ORS 469.060. (Emphasis added.) ORS 469.501(2) in part provides:

"The council may adopt exemptions * * * from any need standard adopted under subsection (1)(L) of this section *if* the exemption is consistent with the state's energy policy * * * and the council's consideration of the implementation of the strategy prepared under ORS 469.060 for reducing the emission of gases that contribute to global warming." (Emphasis added.)

Thus, there is no exemption from the need standard that is authorized unless the council engages in "consideration of the implementation of the strategy" to reduce global-warming gases by 20 percent in the next decade.

The issue in this case is whether EFSC must follow the foregoing statutory law or, instead, may be excused from following it on the bases that were articulated by a hearings officer acting for EFSC. EFSC's order granting a certificate to build a gas-fired generation facility in Oregon fails to show that the state agency complied with those statutory directives. As the following discussion will disclose, the order shows that the agency substituted a different standard, one adopted by another executive branch agency, instead of applying the legislative standard calling for reduction in global-warming gases. But EFSC's order does not show that it meets the substituted standard, either. Permitting a new source must be shown to comply with the law. Even more disturbing, the agency makes no claim that the substituted standard — stabilization — has been met. The agency mentions the stabilization standard only as a basis for failing to follow the statutory reduction, not as the standard that the agency says it applied in this case.

The majority fails to require that the order show compliance with the law, *i.e.*, require that the order show that EFSC engaged in "consideration of the implementation" of the statutory goal of a "reduction" in global-warming gases. Even if "stabilization" could be argued to be a "strategy for reduction by 20 percent," the agency did not, on the record in this case, engage in any "consideration of implementation" of stabilization of the amount of global-warming gases emitted in Oregon.

Petitioners in this case contend that the exemption granted by EFSC for certain gas-fired thermal generating plants, an exemption incorporated into and forming the basis for the agency's granting of a construction permit in this case, does not comply with certain of those statutory duties.

EFSC has granted permits to *increase* rather than reduce the generation of greenhouse gases within Oregon, gases that contribute to global warming. Petitioners' request

for judicial review of granting those permits raises the question whether EFSC complied with the statutes in effect at the time that the permits (siting certificates) were granted. Did the council consider *implementation* of the strategy "for reducing the emission of gases that contribute to global warming * * * by at least 20 percent below 1988 levels by 2005"? Must the council have done so? Was any consideration given that was sufficient to comply with the requirement that it consider "implementation" of the reduction below 1988 levels?[1]

## ANALYSIS

EFSC issued its Final Order on May 11, 1994. The Final Order relied heavily on EFSC's Order dated February 2, 1994. However, when one looks at the February 2, 1994 Order, it is apparent that, in the particulars at issue, it relies heavily and *only on* the hearings officer's report dated January 19, 1994. The siting agency adopted "the reasoning and conclusions of the hearings officer as expressed in his report of January 19, 1994." (Final Order at 11.)

The basis for the hearings officer's report, and of EFSC's order founded on it, is flawed, because it fails to consider and/or analyze the "reduction" requirement of ORS 469.060 in at least three respects.

### A. *Benchmark v. Reduction*

The Final Order articulated, *inter alia*, the following finding:

---

[1] Specifically, ORS 469.501(2) states:

"*The council may adopt exemptions*, except for coal or nuclear power plants, from any need standard adopted under subsection (1)(L) of this section *if the exemption is consistent with* the state's energy policy set forth in ORS 469.010, 469.190 and 469.310 *and* the council's *consideration of the implementation of the strategy prepared under ORS 469.060 for reducing the emission of gases that contribute to global warming.*" (Emphasis added.)

That plain statement of EFSC'S duty in relation to exemptions is contained in Oregon Laws 1993, chapter 569, section 22, which was enacted in lieu of numerous other statutes. This changed the law regarding potential exemptions of generating plants that produce gases associated with global warming.

The new law applied to the site certificates (*i.e.*, permits to construct) for the plant in this case and also for Portland General Electric's Coyote Springs plant.

"EFSC then found that a benchmark of 'stabilizing $CO_2$ emissions at the 1990 level' has been adopted. (Finding #4)." (Final Order at 11.)

That finding of the Final Order is based on the hearings officer's report of January 1994.[2]

ORS 469.060 states that the "purpose of the strategy shall be *to reduce*" certain emissions "by at least 20 percent below 1988 levels by 2005." (Emphasis added.) The hearings officer's report, adopted by EFSC, essentially states that EFSC does not have to follow the mandates of ORS 469.060 for two reasons: because "some of the measures required to meet that target would have substantial negative impacts," and because the 20 percent reduction is a "target," not a requirement. Instead of following any of the statutory mandates, the hearings officer focuses on the Oregon Progress Board's stated "benchmark of *stabilizing* carbon dioxide emissions at the 1990 level." (Emphasis added.)

I cannot agree that the statutes may be discarded and their provisions avoided by substituting the "bench-mark." The statutes cited require the siting agency to comply with them, not some different criteria of the executive branch's Progress Board. On this issue, the hearings officer's recommendation to permit construction of new combustion generators does not carry out the statutory reduction goal set forth in ORS 469.060.

B.  *Lesser Increase v. Reduction*

As another reason for permitting the increase:

---

[2]

"ORS 469.060 includes a requirement that the Department develop a strategy for reducing emissions of gases which contribute to global warming by at least 20% below 1988 levels by 2005. The Department completed that strategy as part of its 1991 energy plan. In fact, some of the measures required to meet that target would have substantial negative impacts and would require drastic actions in terms of increased taxes and curtailment of operations of existing energy facilities. The Legislature has not adopted that target as a requirement. Instead, the Oregon Progress Board has adopted a state Benchmark of stabilizing carbon dioxide emissions at the 1990 level. The Department will be submitting a strategy to the Legislature as part of its 1995 energy plan to address how that target can be met." (Hearings Officer's Report at 5.)

> "The need exemption rule is for 'unlimited amounts of high efficiency cogeneration and limited amounts of renewable resource and efficient * * * natural gas facilities,' and these 'facilities emit less $CO_2$ than new or existing coal or oil plants and existing natural gas plants.' (Finding #5)." (Final Order at 11.)

That finding is not helpful, because it merely states that what EFSC wants to do is "less" polluting than certain other generators are or would be. It does not speak to any actual reduction in global-warming gases nor to the strategy for reduction of those gases by 20 percent below current levels. Instead, EFSC appears to favor the "lesser of two evils" when it states, not how an increase in global-warming gas complies with the reduction statute, but only that "facilities emit less $CO_2$ than new or existing coal or oil plants and existing natural gas plants." This does not advance the reduction requirement of ORS 469.060. An increase in global-warming gases is not justified merely by saying that the increase could have been worse if coal or oil was burned. The reference to other sources of pollution does nothing to carry out the reduction goal set forth in ORS 469.060.

## C. *Natural Gas Exemption*

> "The natural gas exemption is consistent with the four ORS provisions [ORS 469.010, 469.190, 469.310, and 469.060] cited in the above-quoted section of Senate Bill 1016. ORS 469.010 establishes a goal to 'promote the efficient use of energy resources and to develop permanently sustainable energy resources.' It also includes other provisions to encourage such preferred resources and provides that 'cost-effectiveness be considered in all agency decision-making relating to energy facilities.' The Siting Council has implemented these provisions through its rules, including the rules which provide exemptions for renewable resources and a cost-effective test for energy resources." (Hearings Officer's Report of January, 1994, at 5.)

That paragraph of the hearings officer's report is conclusory only. First, the hearings officer states as a conclusion that the natural gas exemption is consistent with ORS 469.060 and three other statutory provisions. He does nothing to show or demonstrate compliance with ORS 469.060 or 469.501(2). Instead of showing compliance, the hearings officer changes

the subject to discuss provisions of ORS 469.010 not related to reductions of global-warming gases. The hearings officer never explains *how* the natural gas exemption promotes or relates to implementation of the reduction mandated by ORS 469.060. Adoption of the hearings officer's comments by the council do not demonstrate compliance with statutory reduction goals that EFSC is mandated to give "consideration of the implementation" to by statute.

In summary, the record of the Order in this case does not support the findings made in EFSC's Final Order. The origin of EFSC's findings is the hearings officer's January 1994 report. That report, and EFSC's findings based on it, failed to advance the reduction requirement of ORS 469.060. The "reduction" language of ORS 469.060 was discarded by interpreting reduction to be only a target, not a requirement. Nothing in the statute supports that interpretation.

EFSC does not attempt to explain how it has complied with the reduction statute at all. Instead, its order claims that it is excused from compliance. In excusing itself from compliance, EFSC does not rely on the language of the statute or on its legislative context, or even on any declaration of ambiguity in the statute.

Instead, the agency's order shows that its consideration of implementation of ORS 469.060 consisted only of labeling the 20 percent reduction provision as a target and pointing out that another agency's policy of stabilization differs from the statutes.

Applying the label of "target" to a goal that the legislature has mandated that state agencies meet does nothing to excuse an agency from meeting that mandate. Yet the agency used that label in this case as if the label, without any further analysis, excused the agency from its duty of "consideration of implementation" of a 20 percent reduction. Likewise, the agency simply stated that "stabilization" is the policy of another agency, as if that other agency's policy overrides the legislative mandate and, thus, excuses EFSC from complying with the statute. Again, as in the labeling exercise, EFSC engages in no analysis of why a different agency's policy of stabilization of emission of greenhouse

gases excuses EFSC from the statutory mandate to consider implementing a 20 percent reduction in those gases.

An administrative agency like EFSC may only take actions that are within the statutes that empower and limit its exercise of governmental authority. Such an agency has no independent source of authority for permitting air pollution or for taking any other action in the name of the people of the state. Where an administrative agency's order is either "[o]utside the range of discretion delegated to the agency by law" or "[o]therwise in violation of a * * * statutory provision," a reviewing "court shall remand the order to the agency." ORS 183.484(4)(b).

The agency order fails to show that it complied with the statutory provisions regarding reduction of global-warming gases when it granted a permit to increase emission of those gases. The order fails to comply with, and therefore violates, the statutory provisions in ORS 469.060 and 469.501(2). Because of the failure of the agency to comply with the mandates of those statutes, its order also is beyond the range of discretion delegated to the agency. Therefore, "the court shall remand the order to the agency."

I cannot simply pass by the agency's failure to show that it has respected the statutes, and by respecting them also has respected the earth and its natural systems in the way mandated. I cannot accept the agency's inattention to the reduction goal set by the politically accountable body, the legislature. The legislature made the policy of protecting the health of the earth applicable even to exemptions from the need standard. The statutes doing so were effective both before the exemption rules were adopted in 1993 and 1994, and also before the certificate or permit to build a polluting generation facility was granted in 1994. Thus, the fact that the plant proposed is declared exempt from the need standard does not exempt it from the requirement of consideration of implementation of reduction in global-warming gases. Enough inattention to the health of our planet home has already transpired. I would remand to ensure that attention to the earth's health replaces the studied inattention inherent in the agency's present order. I dissent from affirmance of that inadequate order.

**UNIS, J.,** dissenting.

The majority affirms an order of the Energy Facility Siting Council (EFSC) that concludes that the statement of fiscal impact that accompanied the notice of intended action in the rule-making procedure for adoption of OAR 345-23-010(2) (1994) was sufficient. Because I believe that the order is insufficient for purposes of judicial review, I would reverse the order and remand this case to EFSC to make an authoritative interpretation of OAR 345-23-010(2) (1992).[1] Accordingly, I dissent.

At issue in this case is the validity of OAR 345-23-010(2) (1994), which exempts certain energy facilities "for which applications have been determined to be complete under OAR 345-21-030 on or before August 13, 1993," from the requirement of demonstrating a need for power. Petitioners allege that OAR 345-23-010(2) (1994) is invalid because EFSC did not follow proper rule-making procedures in enacting the rule. Specifically, petitioners contend that the statement of fiscal impact that accompanied the rule was deficient for a number of reasons.[2] Petitioners contend that one reason the fiscal impact statement is deficient is that OAR 345-23-010(2) (1994) substantially expanded the opportunity for utilities and others to build gas-fired power plants without any determination of need for power by EFSC.

EFSC rejected petitioners' arguments challenging the sufficiency of the fiscal impact statement because, in its view, OAR 345-23-010(2) (1994) did not substantively change the law:

"In addition, the question of fiscal impact implies some change. The rule involved here has been in place essentially

---

[1] This case involves two versions of OAR 345-23-010(2). EFSC amended the rule in January 1994. Throughout this opinion, I refer to the original version as OAR 345-23-010(2) (1992) and to the amended version as OAR 345-23-010(2) (1994).

[2] The statement of fiscal impact provided:

"Permanent adoption of the temporary rules is expected to have no fiscal impact on most applicants for energy facility site certificates. The proposed rules implement changes to EFSC jurisdiction as required by the new statute, clarify the requirement to show need for power for new energy facilities, and allow an exemption from the need standard for applicants whose applications were filed before August 13, 1993. The cost of preparing and reviewing applications for energy facilities site certificates is not expected to change significantly."

unchanged since 1992. The fiscal impact statement accompanied a proposed 1994 rule that merely limited the need exemption rule in place since 1992. The decision on the 1994 rule did not result in any material change to the fiscal impact of the rule." EFSC's Final Order at 7.

The majority agrees with EFSC that the fiscal impact statement for OAR 345-23-010(2) (1994) is sufficient because that rule did not substantively change the law. To make that determination, the majority treats as controlling an interpretation of OAR 345-23-010(2) (1992) expressed for the first time by EFSC's lawyers on review to this court.

Under the Oregon Administrative Procedures Act, this court must determine whether "the agency has erroneously interpreted a provision of law." ORS 183.482(8)(a). Thus, this court must determine whether EFSC has "erroneously" interpreted a provision of law, namely, OAR 345-23-010(2) (1992), an administrative rule promulgated by EFSC. That issue raises important questions: In determining whether an administrative agency has "erroneously" interpreted its own administrative rule, when should the court treat an interpretation made by the agency as controlling?[3] And under what circumstances should the court substitute its own judgment as to how the rule should be interpreted?

The majority appears[4] to apply the following test: The court will treat an agency's interpretation of its own administrative rule as controlling if: (1) the interpretation is not inconsistent with the express provisions of the rule, read in context; (2) the agency's interpretation of its own rule is not inconsistent with the rule's apparent purpose or policy; and (3) the agency's interpretation does not place the rule in

---

[3] I use the terminology "treat the agency's interpretation as controlling" throughout this opinion rather than the word "deference" because the term "deference" is somewhat misleading. "Deference" implies that the court does not give an interpretation controlling weight, but rather considers the agency's interpretation as relevant in formulating the court's own interpretation of the rule.

[4] I question whether this court again is failing to expressly articulate or explain the test for when the court will treat an agency's interpretation of its own rule as controlling. *See City of Klamath Falls v. Environmental Quality Comm.*, 318 Or 532, 538-44, 870 P2d 825 (1994) (reviewing agency interpretation of its own administrative rule under ORS 183.482(8)(a) without identifying the test for determining whether to treat an agency's interpretation as controlling).

conflict with any other provision of law. 320 Or at 143.[5] I agree with the majority that those are appropriate considerations in deciding whether the court should treat an agency's interpretation of its own administrative rule as controlling; however, I believe that there are additional considerations that the court should consider before it treats an agency's interpretation of its own rule as controlling.

In my view, treating an agency's interpretation of its own rule as controlling is sometimes appropriate. When an agency has been delegated authority pursuant to statute, it is often called on to make judgments of two kinds: (1) judgments that call for "factual information and agency expertise," and (2) judgments "about the relative importance of conflicting goals, about values and priorities, in short, policy judgments." *Marbet v. Portland Gen. Elect.*, 277 Or 447, 463, 561 P2d 154 (1977). Treating an agency's interpretation as controlling is appropriate where it is the function of the agency, rather than the court, to make such judgments in the first instance. Thus, if the interpretation of an administrative rule involves the application of expertise, then treating the agency's interpretation as controlling may be appropriate. *See McPherson v. Employment Division*, 285 Or 541, 549, 591 P2d 1381 (1979) (agency has "expertise" where "terms are drawn from a technical vocabulary which takes its meaning from a particular science, industry, trade, or occupation in which the agency has genuine expertise"). In addition, if the interpretation involves a determination of the agency's policy, treating the agency's interpretation as controlling may be appropriate because an agency is typically in a superior position to determine what it intended when it issued a rule. Davis & Pierce, Jr., 1 *Administrative Law Treatise* 282, § 6.10 (3d ed 1994). However, the court should not automatically treat every agency interpretation of its own rule as controlling.

Before considering treating an agency's interpretation of its own rule as controlling, the court should make the following threshold determinations. First, the rule being

---

[5] That test presupposes that the administrative rule itself is valid (*i.e.*, that it was adopted in compliance with proper rule-making procedures, that it is within the scope of the agency's authority, and that it does not conflict with any statutory or constitutional provisions).

interpreted must be a valid rule (*i.e.*, the rule was promulgated pursuant to statutory authority delegated to the agency, is within the range of that delegation, was adopted according to proper rule-making procedure, and does not violate any statutory or constitutional provision). Second, the rule being interpreted must express agency policy, and not merely restate or interpret a statutory policy expressed by the legislature in a statute. If the rule does restate the policy embodied in a statute, then the issue is one of legislative intent, and the rule should be analyzed under *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980).

If the rule is valid and expresses the policy of the agency, the court should carefully consider a number of factors to determine whether it is appropriate for the court to treat the agency's interpretation of its own rule as controlling. The majority here does identify some of those factors, namely that the agency's interpretation is plausible in light of the text and context of the rule and other provisions of law, but fails to recognize others. In my view, the court also should consider the relative roles of the agency and the court in interpreting the rule,[6] including whether the agency has the authority to make policy through adjudication.[7] In addition, I believe that the court should also examine whether the agency's interpretation is consistent with its past interpretations of the rule.[8]

---

[6] This is a question of legislative intent that must be determined by examining the duties and responsibilities of the agency and the extent to which the legislature has expressed its policy by statute. For a similar approach regarding agency interpretations of statutes, see *Springfield Education Assn. v. School Dist.*, 290 Or 217, 227-28, 621 P2d 547 (1980).

[7] *See Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980) (agency lacked authority to formulate general policy through contested cases; prior rule-making was required).

[8] Giving controlling weight to an agency's interpretation of its own administrative rule raises difficult questions when the agency seeks to change its policy by altering its interpretation of an administrative rule. *See* Weaver, *Judicial Interpretation of Administrative Regulations: The Deference Rule*, 45 U Pitt L Rev 587, 620-22 (1984) (discussing desirability of a requirement of consistent application). I do not mean to suggest that an agency is necessarily precluded from changing its policy through a change in interpretation, but when an agency's interpretation has been established and relied on, a valid argument can be made that, in order to change the policy expressed by the interpretation, the agency should engage in rule-making. *Cf. Gaston v. Parsons*, 318 Or 247, 252, 864 P2d 1319 (1994) (a court's interpretation of a statute is treated as if it were part of the statute from its enactment). This case does

Before giving an agency's interpretation controlling weight, however, the court should consider whether the interpretation attributed to the agency is in fact an authoritative agency interpretation. Agencies may act only pursuant to statutory authority, and such authority can be exercised only by authorized personnel. The court should consider the context in which an interpretation is rendered by the agency. Thus, whether an agency's interpretation is rendered by an individual with policy-making authority who was acting in such a capacity is an important consideration in deciding whether to treat an agency's interpretation of its own administrative rule as controlling. *Cf. Ross v. Springfield School Dist. No. 19*, 300 Or 507, 516-19, 716 P2d 724 (1986) (where agency was authorized to make policy collectively, but made decisions in small panels, agency had responsibility to adopt procedure to insure consistent interpretation); *see also Gage v. City of Portland*, 319 Or 308, 313-17, 877 P2d 1187 (1994) (holding that no deference is owed to an interpretation of a local land use ordinance when the person interpreting the regulation is not the one who promulgated it). The context in which the asserted interpretation is made should also be considered. While it may be appropriate for the court to give controlling weight to an interpretation expressed by the agency in a contested case in which the legal issue was squarely presented, for example, it may not be appropriate to treat as controlling an interpretation made by a low-level official in some informal manner. The court should not treat as controlling an agency interpretation of its own rule that is not an authoritative statement by an authorized policy maker.

In this case, these interpretive issues are presented by OAR 345-23-010(2) (1992), which exempts certain facilities from the requirement to demonstrate need

> "unless the capacity of natural gas fired facilities for which applications are pending before the Council, including the proposed facility, plus extant site certificates for natural gas fired facilities exceeds 950 megawatts at the time the application is filed."

not present an issue regarding the required consistency of agency interpretations of administrative rules. I read the majority's opinion to be silent on that issue.

Specifically, this court must determine whether EFSC has erroneously interpreted the term "capacity," as used in OAR 345-23-010(2) (1992).

Turning to the threshold inquiries, petitioners do not contend that OAR 345-23-010(2) (1992) is invalid. The next inquiry is whether the term "capacity," as used in OAR 345-23-010(2) (1992), expresses the policy of the legislature or the policy of the agency. To make this determination, the court should examine the statutes which the EFSC is implementing. The exemption from the need standard in OAR 345-23-010(2) (1992) was authorized by *former* ORS 469.510 (1991), which provided in part:

> "[T]he [EFSC] shall set standards and promulgate rules for the siting * * * of thermal plants and nuclear installations which shall take into account the following:
>
> "* * * * *
>
> "(5) Present and future industrial, commercial, and residential power needs by classes and amount for each class."

ORS 469.510 delegated to the EFSC the responsibility for adopting standards for the siting, operation, and retirement of energy facilities. With regard to the need standard and exemptions therefrom, the legislature has delegated the role of developing policy within the general state energy policies. OAR 345-23-010(2) (1992) represents a policy choice by the agency.

I next consider whether the interpretation attributed to EFSC is an authoritative agency interpretation. In my view, EFSC has not interpreted the term "capacity" in OAR 345-23-010(2) (1992), and the interpretation offered by EFSC's lawyers on review should not be treated as controlling because that interpretation is not an authoritative agency interpretation. EFSC's final order does not contain any reference that could be construed reasonably as an interpretation of the term "capacity," as used in OAR 345-23-010(2) (1992), to refer to "output capacity." *See Springfield Education Assn. v. School Dist.*, *supra*, 290 Or at 227 ("under ORS 183.470, the order itself is the instrument by which an agency demonstrates that a particular interpretation or

application of a statute is within a generally expressed legislative policy"). Nor has EFSC pointed to any other authoritative interpretation in the record.

EFSC's lawyers on review offer arguments that, in essence, ask this court to infer that EFSC adopted such an interpretation. Arguments made in a brief during judicial review of an order such as this one, however, are not agency interpretations. EFSC can adopt only authoritative statements of law through statutorily-authorized methods. In my view, EFSC has never made an authoritative interpretation of OAR 345-23-010(2) (1992). Accordingly, this court should not treat the interpretation offered by EFSC's lawyers on review as controlling.

In my view, the lack of an authoritative interpretation of OAR 345-23-010(2) (1992) renders EFSC's order insufficient for purposes of judicial review. Under ORS 138.482(8)(a), this court must determine if the agency has "erroneously interpreted a provision of law." Because the agency's interpretation is not discernable from the order, this court cannot make that determination:

> "If a statute must be interpreted to determine its applicability to the facts of a contested case, then, it is necessary for the agency to express in its order, to the degree appropriate to the magnitude or complexity of the contested case, its reasoning demonstrating the tendency of the order to advance the policy embodied in the words of the statute. Explicit reasoning will enable a court on judicial review to give an appropriate degree of credence to the agency interpretation." *Springfield Education Assn. v. School Dist.*, *supra*, 290 Or at 228.

In my view, the same need for explicit reasoning applies when an agency is interpreting its own administrative rule. There are good reasons for requiring an agency to articulate its interpretations of its own rules:

> "Such articulation facilitates meaningful judicial review, enables the court on judicial review to give an appropriate degree of credence to the agency's interpretation, serves to assure proper application of the law in the individual case, prevents judicial usurpation of administrative functions, assures more careful administrative consideration, *i.e.*, protects against careless or arbitrary action, provides a source of

guidance for agency personnel as well as for persons governed by the statute, helps develop and maintain the consistency in administration, facilitates the parties' planning, *i.e.*, helps parties plan their cases for rehearings and judicial review, and keeps agencies within their jurisdiction." *Williams v. SAIF*, 310 Or 320, 329, 797 P2d 1036 (1990) (Unis, J., specially concurring; internal quotation marks and citations omitted).

In this case, EFSC's order merely concludes that the fiscal impact statement was sufficient because the adoption of OAR 345-23-010(2) (1994) did not substantively change the law. EFSC's order, however, does not contain any tenable basis for that conclusion. Therefore, EFSC's order is deficient. *See Ross v. Springfield School Dist. No 19, supra*, 300 Or at 517 (an agency's order "must articulate a tenable basis for the legal conclusions by which it applies a statute to the facts").

The majority ignores the deficiency of EFSC's order and instead gives the briefs filed in this court on review the weight of an agency's interpretation. The majority's seeming willingness to credit lawyers' briefs, rather than agency orders, is troubling. This court is authorized to engage in judicial review of agency orders, not briefs, to determine if the agency has erroneously interpreted a provision of law. By accepting the *post hoc* rationalization for EFSC's order articulated by EFSC's lawyers, the majority allows the agency to perpetuate ambiguity to maximize its own authority. An agency

"cannot evade its responsibilities to interpret statutes and rules and to explain rationally why its interpretation and findings lead to its legal conclusion, even though the [agency's] authority * * * is quite broad. Compliance by [an agency] with those responsibilities is not an act of grace." *Weems v. American International Adjustment Co.*, 319 Or 140, 148, 874 P2d 72 (1994) (Durham, J., concurring).

Agencies should, therefore, engage in full and careful reasoning when interpreting their own administrative rules, and they should articulate that reasoning in their orders.

Because the agency failed to articulate its interpretation of OAR 345-23-010(2) (1992), the agency's order is insufficient for purposes of judicial review. Interpreting OAR

345-23-010(2) (1992) requires a determination of the policy that EFSC intended to adopt with its rule. The legislature has assigned that role to EFSC in the first instance. Therefore, this case should be remanded to EFSC for further proceedings to allow EFSC to make an authoritative interpretation of OAR 345-23-010(2) (1992).

I respectfully dissent.

Fadeley, J., joins in this dissenting opinion.