Argued and submitted July 27, 1999, reversed in part; otherwise affirmed
March 8, 2000

## BODY IMAGING, P.C.
### and Paul Meunier, M.D.,
*Petitioners,*

*v.*

## BUREAU OF LABOR AND INDUSTRIES
### and Therese M. Zeigler,
*Respondents.*

### (08-95; CA A99968)

999 P2d 475

Kelly T. Hagan argued the cause for petitioners. With him on the briefs were Cooney & Crew, P. C., Schwabe, Williamson & Wyatt, P. C., Barrie J. Herbold, Leslie S. Johnson, and Markowitz, Herbold, Glade & Mehlhaf, P. C.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent Bureau of Labor and Industries. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance for respondent Therese M. Zeigler.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Body Imaging, P.C. (Body Imaging), complainant's former employer, and Paul Meunier, M.D. (Meunier), apparently the sole shareholder of Body Imaging during the times pertinent to this appeal, seek judicial review of the final order on reconsideration of the Commissioner of the Bureau of Labor and Industries (BOLI). ORS 659.085. The order concluded that: (1) Body Imaging violated ORS 659.425(1)(c) (1989) by changing the terms and conditions of complainant's employment because of a perceived disability;[1] (2) Meunier aided Body Imaging and, thus, violated ORS 659.030(1)(g);[2] and (3) Body Imaging violated ORS 649.425(1)(c) and Meunier violated ORS 659.030(1)(g) by constructively discharging complainant from employment. We review for substantial evidence and errors of law, ORS 183.482(8)(a) and (c), and reverse, in part.

The Commissioner's findings included: Complainant began working for the predecessor of Body Imaging as a receptionist in 1985. From the beginning of her employment, her job performance was inconsistent. In December 1990, complainant experienced numbness on the right side of her face. Reed Wilson, a neurologist, conducted a physical examination of complainant in early 1991 but was unable to determine the exact cause of the numbness. Wilson did not believe

---

[1] ORS 659.425 (1989) provided, in part:

"(1) For the purpose of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:

"* * * * *

"(c) An individual is regarded as having a physical or mental impairment."

The language of the 1989 version of the statute was in effect during the times relevant to this appeal. For the purposes of this opinion, we refer to ORS 659.425 (1989) as ORS 659.425.

[2] At the relevant times, ORS 659.030(1)(g) provided in substance and continues to provide:

"For the purposes of ORS 659.010 to 659.110, 659.227, 659.330, 659.340 and 659.400 to 659.545, it is an unlawful employment practice:

"(g) For any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under ORS 659.010 to 659.110 and 659.400 to 659.545 or to attempt to do so."

that complainant suffered from multiple sclerosis (MS), but he could not rule out that possibility. In early 1992, complainant was given the title "Service Coordinator" by Body Imaging.

> "Her duties were to deliver films and reports and provide pads and forms, referral kits, and information regarding preparation of patients to the staffs of the referring physicians. She dropped off items such as coffee cake and donuts for the staffs and processed and delivered the office newsletter, 'Inside Image.' She explained the changes at Body Imaging, the available services and future plans * * *. The purpose of her efforts was the retention of the existing referral base."

Complainant used her own car to perform her duties as Service Coordinator. The Service Coordinator position was not a full-time position, and complainant also performed receptionist duties when she was not acting as Service Coordinator.

After January 1991, complainant developed headaches and fatigue. Additionally, the numbness increased in severity. In February and April 1992, Margaret Bridges, complainant's immediate supervisor, requested that complainant be examined again.

> "In mid-July 1992, * * * Wilson performed a spinal tap for a CSF test and then ordered another MRI. While the CSF results were 'strongly suggestive of multiple sclerosis,' the MRI was essentially normal. He thought a diagnosis of MS probable, but not confirmed, and recommended that [complainant] be followed with 'serial neurological examinations' (i.e., further tests over time). He shared his findings with [c]omplainant, who told Diana, a co-worker who had accompanied [c]omplainant at the direction of Bridges. Bridges had instructed Diana to call Bridges with the result, which she did in [c]omplainant's presence."

Bridges was concerned about whether complainant should drive on office business and whether allowing complainant to drive subjected Body Imaging to potential liability. She obtained permission from Meunier to contact Body Imaging's attorney and insurance carrier. "Bridges learned from the attorney and the insurance agent that [c]omplainant's driving her own car on company business was not a problem. She reported that [information] to * * * Meunier,

who was still concerned and directed Bridges to prohibit [c]omplainant's driving on company business." At that time, Meunier did not inquire about complainant's symptoms or whether a particular diagnosis had been made. Meunier asked complainant to supply her MRI test result to him. Meunier looked at complainant's MRI test result and saw a portion of the CSF test result. "Meunier said there could be MS and told Bridges that [c]omplainant should not drive for the office."

"Complainant returned to * * * Wilson on August 19, 1992. She had noticed some twitching around her left eye. She also reported a left hand tremor, intermittent myoclonic jerks, fatigue, and that her job duties had been changed due to her condition. * * *

"* * * Because [c]omplainant had no 'neurological handicaps,' Wilson thought the shift in her job duties to be unjustified. He referred [c]omplainant to Dr. Herndon for a second opinion and[,] at her request[,] wrote a letter to her stating[:] 'There is no medical reason why you are not fully capable of employment.' * * *

"* * * Herndon examined [c]omplainant on September 3, 1992. His impression was possible MS. At [c]omplainant's request, he wrote a letter regarding [c]omplainant stating: '[T]here is no contraindication to her continuing to work and specifically no contraindication to her continued driving.' * * *

"* * * The letters from Drs. Wilson and Herndon were given to Bridges by [c]omplainant as they were received. Bridges discussed them with * * * Meunier, who still did not want [c]omplainant to drive for the office. Complainant never resumed the portion of her service coordinator duties that involved driving. The delivery of kits and referral pads, films and reports were handled by others or done by mail. From a projected two days per week on public relations, [c]omplainant was reduced to a few hours a month accompanying Weeks[, Body Imaging's Provider Relations Representative who had been hired in February 1992.]"

The Commissioner found that, after July 14, 1992, Meunier's attitude toward complainant changed. Meunier

"had always been sharp, direct, and authoritative, but after that date things like morning acknowledgments and politeness no longer seemed to include [complainant]. He never explained or discussed the decision regarding driving. He was more critical of her in front of patients and other workers and the severity of his manner, words and tone increased. He focused on [c]omplainant as being responsible for any deficiency among the three receptionists. * * *

"* * * From July 1992 on, [c]omplainant was intimidated by * * * Meunier. She was sometimes in tears from verbal confrontations with him. * * *

"* * * When Stoll[, another doctor] was hired, [Body Imaging] began offering disability insurance to employees, including [c]omplainant. * * * Meunier remarked to Bridges that if anyone needed to get focused or straightened out, it was [c]omplainant because she might need the disability insurance. * * *

"* * * * *

"* * * In November 1992, Bridges placed [c]omplainant, then working as a receptionist, on 90 days probation for failing to return from vacation on time. * * *

"* * * When she could no longer work as service coordinator, [c]omplainant felt demoted, and about January 1993 she sought to return to the position of lead receptionist. She was supported by Bridges and Stoll. * * * Meunier opposed her appointment to the position but allowed it to occur, holding Bridges ultimately responsible for [c]omplainant's performance. * * *

"* * * On or about April 20, 1993, * * * Meunier had instructed that he be scheduled for no more than two procedures an hour. Because she also had standing instructions from him that referring physicians were not to be refused when requesting an immediate scheduling, [c]omplainant inserted two extra appointments. At closing, * * * Meunier profanely questioned her scheduling, accusing her of not paying attention or listening to instructions. He stated [that] she was incompetent and that he had told Bridges that [c]omplainant was not responsible enough to be lead receptionist. Complainant said nothing pleased him since he learned of her MS and he acknowledged that nothing she did pleased him, stating that she was lucky to have a job and that no one would hire her with her condition. The

exchange was loud and lasted over 10 minutes. * * * Meunier did not allow her to explain that she was following his instructions. [Meunier's] anger was such that she felt physically threatened. * * *

"* * * * *

"* * * On May 24, 1993, [c]omplainant worked according to her schedule until 6 p.m. and left. On the following morning, * * * Meunier could not locate the arthrogram films of a patient he had seen the previous evening. When [c]omplainant also could not locate them, * * * Meunier became angry and again accused her of being unable to handle responsibility and of always making mistakes. Complainant learned from the patient that * * * Meunier had given the films to the patient. * * *

"* * * During a conversation about his expectations of [c]omplainant, * * * Meunier told her that he wanted perfection, and that if he was not going to get perfection from her, he would hire someone else who would give him perfection. * * *

"* * * On May 25, 1993, * * * Meunier authored an unscheduled employee evaluation of [c]omplainant. Her performance ratings were mostly 'Needs Improvement,' 'Unsatisfactory,' or 'Not Applicable.' The 'Comments' section of the form stated the following in * * * Meunier's handwriting:

" 'Your personnel file has been reviewed. You have been repeatedly counseled regarding violations of office policy. You are again placed on probation. Any violation of office policy, lack of attention to detail or negativism will result in your immediate termination.

" 'You will 1) Maintain a schedule (30 days in advance) for all receptionists. One receptionist will be sched. 7:00 - 4:00 The second 9:00 - 5:30.

" '2) When Joyce is not sched. as receptionist her time will be sched. for the billing office.

" '3) A no-fail mechanism for signing out films will be immediately instituted. You are responsible for implementation.

" '4) You are again spending too much time in personal phone calls. This must stop.

" '5) You need to improve in the areas noted above. You must reach a new level of professionalism or you will be replaced.'

"* * * Meunier handed the evaluation to [c]omplainant at about 4:15 p.m. on May 25 and spent 10 to 20 minutes going over it with her in detail, particularly the expectations. * * *

"* * * Complainant considered the probation conditions, particularly the film signout requirement, impossible to meet. Specifically, [c]omplainant felt that it would be impossible to design a 'no-fail' system for keeping track of films, because films inevitably get misplaced from time to time. She believed the probation was imposed as justification for eventual termination and was based on her medical condition. She was previously reluctant to resign because she thought she would lose health coverage with a new employer due to her pre-existing neurological condition. She considered that her working conditions had become intolerable, and felt compelled to leave. * * *

"* * * On May 26, 1993, [c]omplainant opened the office and left when the other receptionists arrived. On May 27, 1993, [c]omplainant telephoned * * * Wilson and reported work as being 'very stressful.' She stated she 'kind of' quit that date. She reported stomach upset and feeling anxious and unable to 'unwind.' * * * Wilson prescribed [V]alium for acute anxiety reaction. * * *

"* * * On May 28, 1993, [c]omplainant returned to leave Stoll and * * * Meunier a [signed] copy of the following:

" 'Dear Drs. Meunier and * * * Stoll,

" 'Due to the unprofessional attitude and unrealistic demands placed on me personally by Dr. Paul Meunier, I regre[ ]t * * * to do so but must terminate my employment at Body Imaging P.C. effective immediat[ely] * * *.

" 'I can no longer allow myself to be employed with and work with a company that is extrem[ely] * * * unprofessional and places very high and unrealistic demands on their employees. There has been no compassion or understanding given to me by Dr. Paul Meunier in regards to my medical condition. Since my diagnosis of Multiple Sclerosis in July 1992, it has become quite apparent that Dr. Meunier has changed his attitude and opinion of me both professionally and personally and

has not allowed me to obtain[] * * * the level of employment and work that I was doing prior to that time. This has cause[d] me great fear and stress. The particular incident of April 20, 1993[,] gave me reason to believe that his anger was out of control and could result in personal and physical harm towards me.

" 'Because of these incidents and others and the unrealistic demands and verbal abusiveness and harassment[,] I enclose my keys and vacate the premise[s] * * * today.' "

Our review of the record reveals that the above findings are supported by substantial evidence.

Based on those findings, the Commissioner concluded, in part:

"3) The actions, inactions, statements, and motivations of * * * Bridges and * * * Meunier are properly imputed to [Body Imaging] herein.

"4) At times material herein, * * * Bridges, [Body Imaging's] supervisory employee, regarded [c]omplainant as having multiple sclerosis (MS), a physical impairment, and treated her as if she were substantially limited in the major life activities of employment and transportation. Bridges did this when she suggested to * * * Meunier that [c]omplainant might have an accident in her condition while driving on [Body Imaging's] behalf that would create liability for [Body Imaging]. This substantially limited [c]omplainant's ability to be employed in her public relations, marketing and delivery driving duties and in the additional broad class or range of jobs requiring driving. Complainant had not been diagnosed as having MS and had no impairment that substantially limited her in any major life activity. [Body Imaging] violated ORS 659.425(1)(c) in changing the terms and conditions of her employment.

"5) * * * At times material herein, * * * Meunier aided [Body Imaging] by regarding [c]omplainant as having MS, a physical impairment, and treated her as if she were substantially limited in the major life activities of employment and transportation when he sanctioned the removal of [c]omplainant's driving duties and later continued to prohibit her from driving on [Body Imaging's] behalf. Complainant had not been diagnosed as having MS and had no

impairment that substantially limited her in any major life activity. * * * Meunier violated ORS 659.030(1)(g).

"6) At times material herein, * * * Meunier perceived, regarded and treated [c]omplainant as having MS, a physical impairment, and limited in her major life activity of employment when, based on her perceived medical condition, he made negative remarks about her employability, insurability, performance, competence and responsibility, and placed her on probation with conditions that she felt she could not meet and that could not rationally have been met. All of these actions were unwelcome and offensive to [c]omplainant and made her feel physically threatened. Based on his perception that [c]omplainant was disabled, * * * Meunier intentionally and deliberately created hostile and intimidating terms and conditions of employment so intolerable that a reasonable person in [c]omplainant's position would have resigned because of them. * * * Meunier intended to cause [c]omplainant to resign as a result of those working conditions or knew that she was substantially certain to resign. She did resign as a result of those working conditions. Complainant had not been diagnosed as having MS and had no impairment that substantially limited her in any major life activity. By constructively discharging [c]omplainant, [Body Imaging] violated ORS 659.425 (1) and * * * Meunier violated ORS 659.030(1)(g)."

Body Imaging and Meunier make nine assignments of error on appeal. The first through fourth and eighth assignments of error concern the Commissioner's conclusion that Body Imaging and Meunier unlawfully discriminated against complainant in the terms and conditions of her employment. The fifth and ninth assignments of error concern the Commissioner's conclusion that complainant was unlawfully discriminated against by Body Imaging and Meunier when she was constructively discharged from employment. Finally, the sixth and seventh assignments concern whether Meunier was timely added as a respondent and can be liable for wage loss damages. Because Body Imaging and Meunier's first, third, fourth, fifth, eighth and ninth assignments of error involve issues of substantial evidence or substantial reason that, in our view, do not warrant discussion or interpretations of statutes that are at odds with the plain language of the statutes in issue, we affirm as to those

assignments. However, we write to address Body Imaging and Meunier's second, sixth and seventh assignments of error.

We begin by addressing Body Imaging and Meunier's sixth assignment of error. Meunier argues that BOLI did not have authority to add him as a respondent. Specifically, he argues:

> "The plain language of ORS 659.050(1) permits the addition of respondents only through the conclusion of the investigatory period initiated by the complaint. ORS 659.095(1) requires that at the end of the one[-]year investigation period, the bureau must issue an administrative determination that names the respondent(s) or lose authority to proceed further. Read together, these sections permit the addition of respondents by complaint or joinder only within the one[-]year periods prescribed by ORS 659.040(1) and 659.050(1)."

BOLI counters that the examination of the text and the context of various statutes, including ORS 659.010(13), ORS 659.050(1), ORS 659,060(1) and ORS 659.095, demonstrate that the addition of Meunier as a respondent was timely. Specifically, BOLI argues that ORS 659.050(1) "expressly allows a new respondent to be named either during the investigation or upon its conclusion"; thus, "the statute contemplates an unspecified time after that period in which to add a new respondent."

We take the relevant procedural facts from the Commissioner's order on reconsideration:

> "1)   On August 13, 1993, [c]omplainant filed a verified complaint with the Agency alleging that she was the victim of the unlawful employment practices of [Body Imaging]. After investigation and review, the Agency issued an Administrative Determination finding substantial evidence supporting the allegations of the complaint. * * *

> "2)   On August 24, 1994, the Agency prepared for service on [Body Imaging] Specific Charges, alleging that [Body Imaging] discriminated against [c]omplainant in her employment with [Body Imaging], both on the job and at termination, based on her perceived disability in violation of ORS 659.425. With the Specific Charges, the Agency

served on [Body Imaging] the following: a) Notice of Hearing setting forth the time and place of the hearing; b) a Notice of Contested Case Rights and Procedures containing the information required by ORS 183.413; c) a complete copy of Oregon Administrative Rules (OAR) regarding the contested case process; and d) a separate copy of the specific administrative rule regarding responsive pleadings. * * *

"3) On September 12, 1994, [Body Imaging] through counsel timely filed an answer wherein [Body Imaging] admitted employing [c]omplainant in Oregon and that * * * Meunier was her immediate supervisor. [Body Imaging] denied any unlawful employment practices or damages to [c]omplainant based on disability. * * *

"* * * * *

"7) On June 14, 1995, the Agency filed its motion to amend the Second Amended Specific Charges. * * *

"* * * * *

"9) * * * On December 28, 1995, the forum allowed the requested amendment, which served to join * * * Meunier personally as a respondent to the charges,[3] and directed that the Agency, by January 2, 1996, file its third amended

---

[3] In granting BOLI's motion to add Meunier as a respondent, the administrative law judge ruled:

"While mindful of * * * Body Imaging's argument regarding timeliness, I find that other reasoning from [In the Matter of] Sapp's [Realty, Inc., 4 BOLI 232 (1985),] is more persuasive:

" 'By issuing the initial Administrative Determination [timely under the statute] the Commissioner retained authority to continue proceedings to resolve the instant complaint. There was no requirement that the Agency's investigative efforts end with the issuance of this Administrative Determination. The proceedings which the Commissioner retained authority to continue could well have required or otherwise included further investigation, which led to the discovery of additional persons to be named as Respondents.'

"I agree with [Body Imaging's] counsel that [BOLI's] purported reason for joinder should not be determinative. The financial status of the original Respondent[, Body Imaging,] and of Dr. Meunier do not control joinder. Whether or not Dr. Meunier could be personally liable under * * * [ORS] 659.030(1)(g) is a matter of fact, and[,] thus, at this stage of the proceeding, a matter of pleading. I find that the facts pleaded, if proved, would support a finding that Dr. Meunier, as the princip[al] actor, aided, abetted, incited, compelled or coerced the corporate respondent in acts forbidden under the civil rights statutes." (Third set of brackets in original.)

Because our analysis turns on the meaning of ORS 659.050(1), we express no opinion concerning the correctness of the Commissioner's reasoning in Sapp's Realty, Inc. regarding ORS 659.095(1).

charges incorporating all amendments previously approved by the forum. [Body Imaging and Meunier] were allowed until January 9 to answer the new charges, with the option of allowing the existing answer of the corporate respondent to stand. * * *

"10)  On January 2, 1996, the Agency filed its Third Amended Specific Charges and thereafter counsel timely filed the answer thereto of * * * Meunier and advised the forum that [Body Imaging,] the corporate respondent[,] would rely on its previous answer."

The issue is one of statutory interpretation: Was BOLI authorized to add Meunier as a respondent in January 1996, having filed its initial specific charges in 1994 based on its investigation of complainant's complaint made in 1993? In resolving that issue of statutory construction, we seek to discern the legislature's intent by examining the text and context of the statute. In that examination, words of common usage are given their plain and ordinary meaning in the absence of a contrary suggestion in the statute.

ORS 659.050(1) provides:

"After the filing of any complaint under ORS 659.040 or 659.045, the Commissioner of the Bureau of Labor and Industries may cause prompt investigation to be made in connection therewith. If during the course of such investigation or upon the conclusion thereof it appears to the commissioner that additional persons should be named as respondents in the complaint the names of such persons may be added as respondents thereto. If the investigation discloses any substantial evidence supporting the allegations of the complaint the commissioner may cause immediate steps to be taken through conference, conciliation and persuasion to effect a settlement of the complaint and eliminate the effects of the unlawful practice and to otherwise carry out the purpose of ORS 659.010 to 659.110 and 659.400 to 659.545."

In construing the phrase "upon the conclusion" of the investigation in ORS 659.050(1), we begin by noting that the definition of the word "upon" includes: (1) "immediately following on: very soon after[,]" and (2) "on the occasion of: at the time of[.]" *Webster's Third New Int'l Dictionary*, 2518 (unabridged ed 1993). Either of those definitions reasonably

could apply to the phrase "upon the conclusion" in ORS 659.050(1) and neither supports BOLI's interpretation when the word "upon" is used in connection with the words "the conclusion." Here, the Commissioner's findings demonstrate that the administrative determination as to Body Imaging was made after BOLI's investigation that apparently began in 1993. We perceive no suggestion in the Commissioner's findings that the investigation was not *in fact* complete before the charges were filed in August 1994. BOLI did not attempt to amend its charges to add Meunier as a respondent until June 1995, and the amended specific charges adding Meunier were not filed until January 1996. Consequently, Meunier was not timely added as a respondent "during the course of" the investigation or "upon [its] conclusion" under ORS 659.050(1).[4]

---

[1] BOLI relies on ORS 659.010(13), ORS 659.060 and ORS 659.095(1) to support its contention that the addition of Meunier as a respondent was timely. ORS 659.010(13) provides:

" 'Respondent' includes any person or entity against whom a complaint or charge of unlawful practices is filed with the commissioner or whose name has been added to such complaint or charge pursuant to ORS 659.050(1)."

ORS 659.060(1) provides:

"In case of failure to resolve a complaint after reasonable effort under ORS 659.050, or if it appears to the Commissioner of the Bureau of Labor and Industries that the interest of justice requires a hearing without first proceeding by conference, conciliation and persuasion, or if a written request is made by respondent in accordance with ORS 659.050, the commissioner shall cause to be prepared and served upon each respondent required to appear at such hearing such specific charges, in writing, as the respondent will be required to answer, together with a written notice of the time and place of such hearing."

ORS 659.095(1) provides:

"If within one year following the filing of a complaint pursuant to ORS 659.040(1) or 659.045(1) except a complaint alleging violations of ORS 30.670 or 30.685 the Commissioner of the Bureau of Labor and Industries has been unable to obtain a conciliation agreement with a respondent, or has not caused to be prepared and attempted to serve the specific charges referred to in ORS 659.060(1), the commissioner shall so notify the complainant in writing and within 90 days after the date of mailing of such notice, the complainant may file a civil suit as provided for in ORS 659.121. Within one year following the filing of the complaint, the commissioner may issue, or cause to be issued, an administrative determination. If no administrative determination has been issued at the end of the one-year period, the commissioner has no further authority to continue proceedings to resolve the complaint except as provided in ORS 659.070 and 659.085. If prior to the expiration of one year from the filing of a complaint pursuant to this section the commissioner dismisses the complaint for any reason other than a dismissal pursuant to ORS 659.060(3), or the complainant requests the commissioner to terminate proceedings with respect to the complaint, the commissioner shall notify the complainant of said

In their seventh assignment of error, Body Imaging and Meunier assert that "[a]n individual supervisor cannot be liable for wage loss damages." However, because we have concluded that Meunier was improperly added as a respondent, it is not necessary for us to address this assignment of error. In sum, based on the above reasoning, Meunier was not properly added as a respondent, and we conclude that the Commissioner erred in his adjudication regarding Meunier.

■ We now turn to Body Imaging's second assignment of error concerning whether *former* OAR 839-06-235 (1991) authorized it to change complainant's driving duties temporarily.[5] OAR 839-06-235 provided:

"(1)   An employer may inquire whether an individual has the ability to perform the duties of the position sought or occupied.

"(2)   An employer may not use this type of inquiry with the intent or result that a handicapped person is barred from a position without regard to:

"(a)   The individual's ability or capacity to safely and efficiently perform the duties of the position; and

"(b)   The effect of a reasonable accommodation on the individual's ability to so perform.

"(3)   An employer may require a medical evaluation of an individual's physical or mental ability to perform the work involved in a position:

"(a)   The individual seeking or occupying a position must cooperate in any medical inquiry or evaluation, including production of medical records and history relating to the individual's ability to perform the work involved; and

---

dismissal or termination in writing, and within 90 days after the date of mailing of such notice of dismissal or termination, a civil suit may be filed as provided for in ORS 659.121."

Those statutes say nothing about the procedure for adding a respondent or the time within which a respondent must be added. Additionally, those statutes do not limit the investigation period. Thus, they do not support BOLI's arguments that the addition of Meunier as a respondent was timely.

[5] For purposes of this opinion, we will refer to *former* OAR 839-06-235 (1991) as OAR 839-06-235.

"(b) If the employer requires a medical evaluation as a condition of hire or job placement and the evaluation verifies a physical or mental impairment affecting the ability to perform the work involved, or verifies a present risk of probable incapacitation, the employer may not refuse hire or job placement based on the individual's impairment unless no reasonable accommodation is possible;

"(c) Nothing in this rule shall be construed to alter or modify the provisions of ORS 659.330.

"(4) Where an employer relies on medical evidence to determine whether an individual is able to perform the work involved, the Division will consider only medical evidence available to the employer at the time the employment decision was made, including:

"(a) Medical evidence known to the employer; and

"(b) Medical evidence which should have been known to the employer through reasonable diligence."

Body Imaging asserts that "[t]his court will divine the intent of an agency in promulgating a rule in the same manner it construes a statute, looking first to the rule's text and context. *Pilgrim v. Clatskanie People's Utility Dist.*, 149 Or App 234, 238, 942 P2d 821 [(1997)], *rev den* 326 Or[ ] 389, * * * (199[8])." Specifically, it argues:

"The rule does three things of particular importance in this case: (1) It imposes a duty of diligence on the employer when making [a] medical inquiry into the employee's fitness for a position sought or occupied. (2) It expressly contemplates medical evaluation of existing employees. (3) It contemplates conditioning job placement on the results of medical inquiries. Taken as a whole, [Body Imaging] submit[s] that this rule authorizes exactly what occurred in this case: Upon learning of [complainant's] impairment, and upon observation of potentially driving-dangerous symptoms, [Body Imaging] conditioned her further performance of driving duties on medical evidence of her ability to perform the work involved safely. They sought the best medical evidence available to them: the opinions of [complainant's] physicians. By engaging in conduct authorized by the Commissioner's rule, [Body Imaging] cannot be deemed to have treated [complainant] as if she were substantially limited in a major life activity."

BOLI counters:

> "[T]he [C]ommissioner construed the rule not to authorize an employer to change an employee's duties pending the receipt of a medical evaluation, where the employee actually had the present ability to perform the job. The [C]ommissioner did not err in so construing the rule.

> "In relying on the rule, petitioners ignore the deference to which the [C]ommissioner's interpretation is entitled. This court must defer to the agency's plausible interpretation of its own rule so long as that interpretation 'cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law.' *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994)."

ORS 651.050(1) provides that the Commissioner of BOLI shall enforce "[a]ll laws regulating the employment of adults[,]" of which ORS 659.425 is a part. ORS 659.103(1)(e) provides that the Commissioner may "[e]stablish[ ] rules covering any other matter required to carry out the purpose of ORS 659.010 to 659.110 and 659.400 to 659.545." OAR 839-06-235 appears to have been adopted in 1984, and, as OAR 839-06-201 (1991) explained: "These rules [of which OAR 839-06-235 is apparently a part,] contain the interpretation of ORS 659.400, 659.405, 659.425 and 659.435, which the Civil Rights Division uses in enforcing these sections." In *Don't Waste Oregon Com.*, the Supreme Court stated:

> "When an agency's interpretation of its own rule is consistent with the wording of that rule, considered in its context, and when no other source of law establishes that the agency's interpretation of the rule is impermissible, what is the result of judicial review of that interpretation of the agency's rule under ORS 183.482(8)(a)?

> "As noted, this court is authorized to overrule an agency's interpretation of a rule if an agency has 'erroneously interpreted a provision of law.' ORS 183.482(8)(a). In this case, the 'provision of law' is the rule itself. Where, as here, the agency's plausible interpretation of its own rule cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law, there is no basis on which this court can

assert that the rule has been interpreted 'erroneously.' " 320 Or at 142.

Consequently, we conclude that, because OAR 839-06-235 is a BOLI rule, we are to apply the *Don't Waste Oregon Com.* analysis to the Commissioner's interpretation of that rule, rather than the analysis urged by Body Imaging.[6]

■ BOLI is correct that the Commissioner's interpretation of OAR 839-06-235 does not conflict with the language of the rule. OAR 839-06-235 provides a framework within which an employer may obtain information about an individual's "ability to perform the duties of the position sought or occupied," including information from medical evaluations. However, the rule does not expressly provide for the temporary change of an employee's duties pending the employer's receipt of medical information.

Even when OAR 839-06-235 is read in context with the other rules to which Body Imaging cites,[7] there is nothing

---

[6] Body Imaging's reliance on *Pilgrim* is misplaced. *Pilgrim* is a civil case in which the court was called on to interpret the meaning of the rule in the first instance. *Don't Waste Oregon Com.* is an administrative law case where the court was called upon to review an agency's interpretation of its own rule.

[7] Body Imaging points to *former* OAR 839-06-225 (1991) and *former* OAR 839-06-230 (1991). *Former* OAR 839-06-225 (1991) provided:

"(1) To come within the protection of ORS 659.425, a handicapped individual must be able to perform the duties of the position occupied or sought. 'Able to perform' shall mean, subject to the provisions of OAR 839-06-230:

"(a) Possessing the training, experience, education, and skill necessary to perform the duties of the position and normally required by the employer of other candidates for the position; and

"(b) Possessing the ability to perform the job safely and efficiently, with reasonable accommodation and without present risk of probable incapacitation to him/herself. An individual occupying a particular position may at any time be evaluated to determine if there is a present risk of probable incapacitation to him/herself.

"(2) An employer may not use the provisions of this section as a subterfuge to avoid the employer's duty under ORS 659.425."

Additionally, *former* OAR 839-06-230 (1991) provided:

"(1) Notwithstanding other provisions of these rules, a position which by its very nature includes an inherent risk of injury or incapacitation to co-workers or the general public need not be filled by a handicapped individual if, even with reasonable accommodation, the inherent risk is materially enhanced because of the individual's impairment.

"(2) To meet the provisions of section (1) of this rule it must be demonstrated that, as it affects the performance of the actual job duties, the

in that context to indicate that the Commissioner erred in interpreting OAR 839-06-235 as he did. The rules reflect a scheme that allows an employer to obtain information and provides guidance to the employer about the employment decisions that it may make based on the information. The language of the rules does not expressly authorize an employer's temporary change of an employee's employment duties pending the receipt of information that the rules allow employers to obtain.

Finally, we must inquire as to whether the Commissioner's interpretation of the rule is inconsistent with other statutes. The plain language of ORS 659.425 (1989), the statute that the rule was promulgated to help interpret, prohibits discrimination in the terms and conditions of employment when an individual is regarded as having a physical or mental impairment, even though the condition does not exist. ORS 659.425 does not distinguish between permanent and temporary discrimination. Hence, the Commissioner's interpretation that the rule does not authorize even a temporary change pending an investigation is a plausible interpretation of both BOLI's rules and the governing statutes. Consequently, we defer to it. Because OAR 839-06-235 did not authorize Body Imaging to temporarily change complainant's driving duties pending the receipt of medical information, Body Imaging's arguments fail.

Reversed as to petitioner Meunier; otherwise affirmed.

---

individual's impairment with reasonable accommodation would result in a greater risk of injury or incapacitation to co-workers or the general public than is true for others qualified to perform such work and not so impaired."