Argued and submitted May 26, 2011, affirmed September 26, 2012

In the Matter of the Compensation of
Rebeca F. Ramos, Claimant.

SAIF CORPORATION;
and Bosky Dell Natives, Inc.,
*Petitioners,*

*v.*

Rebeca F. RAMOS,
*Respondent.*

Workers' Compensation Board
0805154; A145800

287 P3d 1220

David L. Runner argued the cause and filed the briefs for petitioners.

Bennett P. Dalton argued the cause for respondent. With him on the brief was Guinn & Munns.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

HASELTON, C. J.

**HASELTON, C. J.**

In this workers' compensation case, SAIF and employer seek judicial review of a Workers' Compensation Board (board) order on reconsideration awarding claimant permanent partial disability benefits (PPD).[1] ORS 656.214. SAIF argues that the board erred by relying on a medical arbiter's findings when the Department of Consumer and Business Services Workers' Compensation Division Appellate Review Unit (ARU)[2] had "cancelled" the medical arbiter examination. ORS 656.268.[3] SAIF also assigns error to the board's determination that claimant's accepted condition was medically stationary at the time of the arbiter examination. ORS 656.005(17); ORS 656.268. We review the board's decision for substantial evidence and errors of law, and to determine whether the board's analysis comports with substantial reason. ORS 656.298(7); ORS 183.482; *SAIF v. Martinez*, 219 Or App 182, 184, 182 P3d 873 (2008). For reasons amplified below, we conclude that the board did not err in considering the medical arbiter's report and that substantial evidence supported the board's conclusion that claimant's condition was medically stationary. Thus, the board did not err and, accordingly, we affirm.

The material procedural circumstances of this case, pertaining to the respective roles of the ARU and the board in addressing claimant's asserted entitlement to permanent disability benefits, are convoluted, albeit uncontroverted. Claimant suffered a compensable knee injury in March 2007 while she was working as a laborer at a plant nursery. Claimant's accepted conditions include right knee strain and right knee medial meniscus tear. In August 2007, claimant underwent knee surgery. That surgery was ineffective, and claimant was unable to return to work. Claimant then underwent another, similar operation in January 2008. After

---

[1] Petitioners in this case are SAIF Corporation and Bosky Dell Natives, Inc. For ease of reference, we refer to them collectively as SAIF.

[2] Throughout this opinion, "the director" refers to the director of the Department of Consumer and Business Services, and "the department" refers to that department.

[3] Some of the pertinent statutory provisions and rules have been amended and renumbered; because the pertinent provisions have not been materially altered, we cite the current version.

that second surgery, claimant continued to experience knee pain and functional problems, which she reported prevented her from doing "almost all physical activities," including housework and physical labor. Claimant never returned to work.

In March 2008, claimant's attending physician, Dr. Black, an orthopedic surgeon, examined her, and he reported that claimant's subjective complaints were "out of proportion" to his physical findings. Black recommended an independent medical examination. OAR 436-010-0265. On May 12, 2008, the independent medical examiner, Dr. Vesseley, an orthopedic surgeon, found that claimant's reports were inconsistent with his physical observations and, as a result, he reported that his impairment findings were "invalid." OAR 436-035-0007(11).[4] Vesseley ultimately rendered an opinion that claimant was medically stationary and able to return to work. He also recommended "no further treatment regarding the knee at this time." Black concurred with Vesseley's evaluation and cleared claimant to return to work "full duty with no restrictions" on May 28. OAR 436-030-0035(5). SAIF closed the claim on June 16, 2008, and awarded claimant two percent PPD. *See* ORS 656.268(1)(a) (providing for the closure of workers' compensation claims when "[t]he worker has become medically stationary and there is sufficient information to determine permanent disability"); ORS 656.005(17) ("'Medically stationary' means that no further material improvement would reasonably be expected from medical treatment, or the passage of time.").

Claimant requested reconsideration from the ARU, contesting, among other things, the impairment rating provided at claim closure.[5] The ARU scheduled a medical arbiter examination for August 14, 2008, with Dr. Tatsumi.

---

[4] OAR 436-035-0007(11) provides, in part:

"Upon examination, findings of impairment which are determined to be ratable under these rules are rated unless the physician determines the findings are invalid and provides a written opinion, based on sound medical principles, explaining why the findings are invalid. When findings are determined invalid, the findings receive a value of zero."

[5] The parties raised issues regarding "premature closure, medically stationary date as set, temporary disability as given, disagreement with impairment findings used, and extent of whole person permanent partial disability."

ORS 656.268(8)(a).[6] However, before that examination occurred, the ARU determined that claimant's condition was not medically stationary. In doing so, the ARU apparently relied on a report in which Dr. Zenoniani, claimant's new attending physician, found that claimant had a "functional deficit—which may be permanent," that she was in physical therapy, and that she should not return to work. That report was dated June 24, 2008, which was after the notice of closure and during the pendency of the ARU's reconsideration.

On July 23, 2008—three weeks before the scheduled medical arbiter examination with Tatsumi—the ARU asked the parties to consent to postpone the reconsideration until claimant's condition became medically stationary. ORS 656.268(8)(i)(B) ("If the worker's condition has substantially changed since the notice of closure, upon the consent of all the parties to the claim, the director shall postpone the proceeding until the worker's condition is appropriate for claim closure under subsection (1) of this section."). Claimant consented to postponement; SAIF, however, did not. Consequently, the ARU determined that

"the record developed at the time of claim closure on June 16, 2008, specifically the May 12, 2008, independent medical examination (IME), with May 28, 2008, attending physician concurrence, is used to determine the extent of any permanent impairment."[7]

---

[6] ORS 656.268(8)(a) provides:

"If the basis for objection to a notice of closure issued under this section is disagreement with the impairment used in rating of the worker's disability, the director shall refer the claim to a medical arbiter appointed by the director."

[7] OAR 436-030-0165(9) provides:

"When the worker's medical condition is not stationary on reconsideration which may result in difficulties in obtaining findings of impairment by the arbiter, the director will, where appropriate, send a letter to the parties requesting consent to defer the reconsideration proceeding.

"(a) If the parties agree to the deferral, the reconsideration proceeding will be deferred until the medical record reflects the worker's condition has stabilized sufficiently to allow for examination to obtain the impairment findings. The parties must notify the director when it is appropriate to schedule the medical arbiter examination and provide the necessary medical records when requested. Interim medical information that may be helpful to the director and the medical arbiter in assessing and describing the impairment due to the compensable condition may be submitted at the time the parties notify the director that the medical arbiter exam can be scheduled. The director will determine whether the interim medical information is consistent with the provisions of ORS 656.268(6) and (8).

The ARU did not consider Zenoniani's June 24 report in determining the extent of permanent impairment during the reconsideration because that report postdated claim closure. Additionally, because the ARU would rely only on the record that existed at the time of claim closure, the ARU determined that the scheduled August 14 medical arbiter examination was no longer necessary. Accordingly, on July 29, the ARU sent a letter to the parties, and an e-mail to Tatsumi, stating that the arbiter examination had been "cancelled."

The next day, July 30, 2008, the ARU issued its order on reconsideration. Relying on Vesseley's May 12 report and Black's concurrence, the ARU determined that the claimant's condition was medically stationary on May 12, 2008. The ARU awarded claimant two percent PPD based on her first knee surgery, reasoning that "[o]verall, aside from the surgical value * * *, a review of the findings disclosed no other valid objective evidence of permanent loss of use or function due to the accepted condition(s)." Claimant requested a hearing before an administrative law judge (ALJ) to review that order, again contesting the impairment rating and asserting that the closure was premature.

On August 14, 2008, with review pending, claimant visited Tatsumi's office for the previously scheduled medical arbiter examination. It is unclear from the record whether Tatsumi actually received the e-mail that the ARU reported to have sent to inform him that claimant's scheduled examination had been "cancelled." In any event, for whatever reason, Tatsumi proceeded to perform the examination and submitted a medical arbiter report to the ARU the following day, August 15, 2008. ORS 656.268(8)(g) ("The findings of the medical arbiter or panel of medical arbiters shall be submitted to the director for reconsideration of the notice of closure."). In that report, Tatsumi stated that claimant's accepted conditions caused her pain, swelling, impaired

---

"(b) If deferral is not appropriate, at the director's discretion either a medical arbiter examination or a medical arbiter record review may be obtained, or the director may issue an Order on Reconsideration based on the record available at claim closure and other evidence submitted in accordance with ORS 656.268(6)."

range of motion, and significantly limited claimant's "ability to repetitively use her right knee."

After receiving Tatsumi's report, the ARU's medical arbiter coordinator sent a letter to claimant's counsel on August 29, 2008, which stated, in part:

"On July 29, 2008 all parties to this claim were notified that the August 14, 2008 examination with Dr. Tatsumi was cancelled. On that same date, the [ARU] emailed the Arbiter Physician that the August 14, 2008 appointment had been cancelled.

"* * * * *

"While it is unfortunate that Dr. Tatsumi's arbiter examination went forward after cancellation notices were issued, the effect is still the same. Clearly, the worker was not medically stationary at the time of the August 14th evaluation and the findings obtained on that date are not reflective of permanent impairment. From the [ARU]'s perspective Dr. Tatsumi's evaluation and report are *non-viable* and have *no standing* in the reconsideration proceeding culminating in the Order on Reconsideration of July 30, 2008."

(Emphasis added.)

Notwithstanding the ARU's characterization of the medical arbiter report as "non-viable," on review both parties submitted that report to the ALJ. SAIF, despite its initial submission of the report, subsequently objected to its admission, contending that the report should not be admitted because the ARU had "cancelled" the examination and, thus, the examination had been "conducted by mistake" and was "not authorized." Notwithstanding that objection, the ALJ admitted the report because, as noted, SAIF had included the report in its exhibits. The ALJ alternatively reasoned that ORS 656.268(6)(f)—which provides that "[a]ny medical arbiter report may be received as evidence at a hearing even if the report is not prepared in time for use in the reconsideration proceeding"—independently permitted the admission of the report. Nevertheless, the ALJ decided not to rely on Tatsumi's findings to rate claimant's permanent disability, reasoning as follows:

"Dr. Tatsumi examined claimant and considered her accepted conditions, which included right knee strain and right knee medial meniscal tear. He noted that claimant was having difficulty walking and kneeling and was currently receiving physical therapy. Finally, Dr. Tatsumi also reported that claimant was 'under the medical care of Dr. Zenoniani who apparently is going to order another knee MRI to evaluate any further knee pathology.' He found that, 'at this time, the patient is significantly limited in her ability to repetitively use her knee due to her accepted conditions.'

"Under the circumstances, Dr. Tatsumi's opinion establishes that claimant was no longer medically stationary at the time of the medical arbiter exam. Therefore, it is not appropriate to rely on the arbiter's report to rate permanent disability."

The ALJ ultimately affirmed the ARU's award of two percent PPD, based on Vesseley's impairment findings and Black's concurrence.

Claimant requested board review, again challenging the impairment rating and further asserting that her claim had been prematurely closed. On review, SAIF again objected to admission and consideration of Tatsumi's report. The board first rejected claimant's argument that the closure was premature. Then, relying on Tatsumi's report, the board determined that "claimant had reduced range of motion (ROM) in the right knee and was significantly limited in her ability to repetitively use her right knee due to her accepted conditions." The board consequently increased claimant's impairment rating and awarded 11 percent PPD.

As particularly pertinent to our review, the board explained the reasons underlying its determination that it could properly consider Tatsumi's report:

"[W]hile ORS 656.268([8])(i)(A) gives the ARU discretion to not appoint a medical arbiter, here, it had already made an appointment. Because the appointment had already been confirmed, the ARU had already completed the 'referral' stage governed by ORS 656.268([8])(i)(A) when it subsequently attempted to cancel the arbiter examination. Under such circumstances, for its cancellation of the

appointment to be effective, the ARU had to *successfully* provide notice of the cancellation to the arbiter."

(Emphasis added.) The board went on to explain that it was, in fact, *required* to rely on Tatsumi's findings and determined that claimant's condition was medically stationary on the date of the examination, August 14, 2008:

"On reconsideration, where a medical arbiter is used, impairment is established based on objective findings of the medical arbiter, except where a preponderance of the medical evidence demonstrates that different findings by the attending physician are more accurate and should be used. OAR 436-035-0007(5). Absent persuasive reasons to the contrary, we are not free to disregard the medical arbiter's impairment findings when the arbiter unambiguously attributes the claimant's permanent impairment to the compensable condition. *Hicks v. SAIF*, 194 Or App 655, 659, [96 P3d 856], *modified on recons*, 196 Or App 146[, 100 P3d 1129] (2004).

"We find no persuasive reasons to disregard Dr. Tatsumi's impairment findings. First, although Dr. Tatsumi noted that claimant was currently receiving physical therapy and that another knee MRI was pending, there is no indication that his findings represented nonpermanent residuals of the compensable injury. In reaching this conclusion, we note that it is well-established that the term 'medically stationary' does not mean that there is no longer a need for continuing medical care. *Maarefi v. SAIF*, 69 Or App 527, 531[, 656 P2d 1055] (1984)[.]

*"Here, despite the fact claimant was undergoing physical therapy and additional testing, Dr. Tatsumi did not say that her condition was not medically stationary, that it was premature to determine her permanent impairment, or that his impairment findings were not permanent. Nor did he state that his findings were not valid.* Rather, he unequivocally attributed claimant's impairment to the accepted conditions. Given such circumstances, we decline to infer from Dr. Tatsumi's mention of claimant's physical therapy and MRI testing that he reasonably expected claimant's conditions to materially improve from such treatment or the passage of time."

(Some citations and footnote omitted; emphasis added.)

SAIF sought reconsideration, arguing, in part, that no statute or rule requires the ARU to "successfully" notify a medical arbiter that a scheduled examination had been cancelled and that the board "should have deferred to the ARU's interpretation of its own rules on the issue of the non-viability of Dr. Tatsumi's 'erroneously' produced report." SAIF also alternatively argued that Tatsumi's report indicated that claimant's condition was not medically stationary at the time of the examination and, thus, Tatsumi's impairment findings were "not necessarily permanent, especially given claimant's then-current medical treatment and upcoming MRI."

On reconsideration, the board observed that, "while [it] may be true" that no rule requires successful notice of cancellation,

> "there is also no statute or rule addressing the 'cancellation' of an arbiter's appointment or examination if the examination has already been scheduled *before* the Director determines that the claimant's condition is not medically stationary at the time of reconsideration, which is what occurred in this case."

(Emphasis in original.) The board concluded that, given the absence of such a "statute or rule" addressing the circumstances of the "cancelled" arbiter examination here, it would adhere to its previously expressed analysis. The board also affirmed its prior determination that claimant's condition was medically stationary on August 14, reiterating its prior reasoning in that regard. Accordingly, on reconsideration, the board adhered to its order on review. SAIF seeks judicial review of the board's order on reconsideration.

On judicial review, the parties dispute what constitutes effective "cancellation" by the ARU of a medical arbiter examination (*viz.*, whether receipt of a notice of cancellation is required) and, in all events, the effect of such "cancellation" on the propriety of the board's consideration and eventual reliance upon the "cancelled" report. SAIF's primary argument is that, because "the medical arbiter

examination process is within the delegated authority of the director," and not the board, the board ought to have "deferred" to "the department's own interpretation of its own delegated authority," as (purportedly) expressed in the ARU medical arbiter coordinator's letter of July 29, 2008. In that regard, SAIF invokes ORS 656.726(4)(a), which charges the director "with duties of administration, regulation and enforcement of" chapter 656 and provides that the director has authority to "[m]ake and declare all rules and issue orders which are reasonably required in the performance of the director's duties." Additionally, SAIF refers to ORS 656.268(8), which sets out the director's duties related to medical arbiter examinations. SAIF concedes that no existing rule pertains to, or expressly allows for, the "cancellation" of medical arbiter examinations. Nonetheless, SAIF relies on the Supreme Court's decision in *Booth v. Tektronix*, 312 Or 463, 823 P2d 402 (1991), for the proposition that "[a] specific rule * * * is not necessary for the principle of deference to apply."[8]

SAIF alternatively argues that the board's determination that claimant's condition was medically stationary on August 14, 2008, was not supported by substantial evidence and substantial reason. SAIF contends that Tatsumi's observation that claimant was participating in physical therapy and would undergo an MRI indicated that claimant's condition was *not* medically stationary and, thus, that Tatsumi could not have accurately assessed claimant's permanent disability.[9] SAIF also challenges the

---

[8] In *Booth*, the court observed:

"The Board is permitted * * * to adopt a general policy interpreting one of its rules that will be applicable to future cases. The Board, in its interpretation * * *, relied upon the express policy of the Workers' Compensation Law that seeks to avoid the delay and excessive costs caused by litigation and the adversarial system. The Board's interpretation is not inconsistent with this express policy, and it is not our task on judicial review to evaluate these competing interests and substitute our judgment for the judgment of the Board on what policy provisions should prevail * * *."

312 Or at 473-74 (citations and footnote omitted).

[9] We note—as the board cautioned on reconsideration—that the statutory scheme allows for "possible instances of gamesmanship" in situations where the insurer does not consent to postponement of the reconsideration proceedings and the department chooses to base its order on reconsideration upon the record available at closure. In those instances, as the board observed, "proceeding with reconsideration based on the documentary record (without the participation of an arbiter) effectively gives the [insurer] unilateral authority to prevent a claimant

board's reliance on a negative inference or, as SAIF puts it, "The board erred in concluding that claimant was medically stationary at the time of [the medical arbiter examination] *based on what Dr. Tatsumi did not say* in response to questions he was not asked."[10] (Emphasis added.)

Claimant responds that the ARU's stance regarding the "viability" of the report is not entitled to "deference" because, "while the Director's plausible interpretation of its own properly promulgated administrative rule would be entitled to deference, no deference is necessary when there is no rule to interpret," nor where the purported interpretation is inconsistent with any other source of law. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (holding that a court should uphold an agency's "plausible interpretation" of its own rule that is not "inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law"). Claimant contends that (a) the ARU was not interpreting a rule; and (b) the cancellation concept is inconsistent with ORS 656.268(6)(f), which broadly allows for the admission of "[a]ny medical arbiter report."

Claimant further asserts on review that the board properly made its own determination regarding the medically stationary date because, "although the Director determined that claimant's condition was not medically stationary, neither the ALJ nor the Board were bound by the Director's determination, and the Board correctly weighed the evidence in the context of the entire record." In that regard, claimant posits that "the mere fact that a worker is still receiving treatment, diagnostic or otherwise, *** has

---

from receiving the medical arbiter report to which he/she is statutorily entitled." Moreover, "when a claimant's condition has become nonmedically stationary, it is difficult to identify a reasonable basis for [insurer] opposition to the postponement of the proceeding other than a tactical one."

[10] SAIF also argues that the board's determination that claimant's condition was medically stationary "effectively shifts the burden of proof" from claimant to SAIF. In support of that argument, SAIF cites ORS 656.266(1), which provides that "[t]he burden of proving that an injury or occupational disease is compensable and of proving the nature and extent of any disability resulting therefrom is upon the worker." The short and dispositive answer to that contention is that the determination of whether a claimant's condition is medically stationary is distinct from the determination of whether an injury is compensable and, if so, "the nature and extent" of the claimant's disability.

no bearing on her medically stationary status" because "a condition can be medically stationary, as the Board noted, and still require continuing medical care."

We begin with the "cancellation" question—and SAIF's assertion that the ARU medical arbiter coordinator's letter embodied a determination as to what constitutes "cancellation" and the consequences of such a cancellation, to which the board was obligated to "defer." We conclude that "deference" is inappropriate here for two reasons. First, as claimant points out, the ARU was not interpreting a rule regarding "cancellation" of a medical arbiter examination because no such rule exists. Without a predicate rule— the necessary precondition to *Don't Waste Oregon Com.* deference—we cannot evaluate whether the ARU's cancellation concept is a "plausible interpretation" of its own rule.[11] Second, with respect to the effect of the purported "cancellation," the director's delegated authority over the medical arbiter examination *process* is not the same as the authority to determine the ultimate admissibility, validity, or weight of a medical arbiter's impairment findings. As explained in detail immediately below, the Workers' Compensation Law and the department's own rules reveal that the compensation scheme favors inclusion and reliance upon medical arbiter findings.

As the board noted on review, *see* 252 Or App at 369, the department's own rules require that impairment determinations be based on the medical arbiter's findings. OAR 436-035-0007(5) provides, in part:

"On reconsideration, where a medical arbiter is used, impairment is established based on objective findings of the medical arbiter, except where a preponderance of the medical evidence demonstrates that different findings by the attending physician are more accurate and should be used."

In *O'Connor v. Liberty Northwest Ins. Corp.*, 232 Or App 419, 222 P3d 1097 (2009), we held that,

"on reconsideration, the impairment must be based on the medical arbiter's objective findings. There are two

---

[11] Given that circumstance, we need not address whether, or to what extent, the ARU medical arbiter coordinator's interpretation of an extant rule, promulgated by the director, could ever be entitled to *Don't Waste Oregon Com.* deference.

exceptions: (1) where the medical arbiter states that those findings are invalid; or (2) where a preponderance of the evidence demonstrates that different findings are more accurate. If a preponderance of the medical evidence shows that the attending physician's findings are more accurate, then the impairment is rated based on those findings or on closure findings made by a consulting physician if the attending physician concurs in those findings.[3]

"[3] We emphasize that OAR 436-035-0007([11]) does not require a finding by the medical arbiter that the findings are *valid*. The findings are to be rated unless the medical arbiter determines that they are invalid or the evidence indicates otherwise."

*Id.* at 426 (emphasis in original).

Here, Tatsumi did not report that his impairment findings were invalid. Nor do we understand SAIF to argue that "a preponderance of the evidence demonstrates that different findings are more accurate." Thus, the "cancellation" concept that SAIF urges is inconsistent with ORS 656.268(8)(a), ORS 656.268(6)(f), and the department's own rule, OAR 436-035-0007, which require the board to consider the medical arbiter report. We thus reject SAIF's cancellation argument and conclude that the board properly relied upon Tatsumi's presumptively valid findings to rate claimant's impairment.

The remaining issue is whether the board erroneously determined that claimant's condition was medically stationary at the time of the medical arbiter examination. That issue reduces to whether the board's determination is supported by substantial evidence. ORS 656.298(7); ORS 183.482(8)(c). We conclude that it is. SAIF initially determined that claimant's condition was medically stationary on May 12, 2008, based on the medical reports from Black and Vesseley. The board was not required to conclude that claimant was not medically stationary on August 14, 2008, based on the fact that claimant was in physical therapy and scheduled to undergo an MRI. In *Clarke v. SAIF*, 120 Or App 11, 852 P2d 208 (1993), we rejected the claimant's contention that he was not medically stationary because his doctor had prescribed a leg brace to

support his weak leg and ankle. We explained that "medical treatment prescribed solely to improve a claimant's functional abilities is not pertinent to the determination of a claimant's medically stationary date under ORS 656.005(17)." *Id.* at 13-14. Similarly, here, the record would permit a reasonable person to find that the physical therapy and MRI—which were prescribed after claimant's condition had become medically stationary—were "continuing medical care," aimed at improving claimant's functional abilities, and not an indication that claimant's accepted condition would reasonably be expected to materially improve as a result of that treatment or the passage of time. Indeed, that is precisely the rationale that the board expressed here. *See* 252 Or App at 369. Thus, the board did not err in determining that claimant's condition was medically stationary on August 14, 2008.

The board did not err in considering Tatsumi's report and modifying claimant's PPD award based on its review of the entire record. Accordingly, we affirm.

Affirmed.