Submitted August 29, 2013, reversed and remanded January 23, 2014

In the Matter of the Compensation of
Tyrel Albert, Claimant.

CENTRAL OREGON INTERGOVERNMENTAL
COUNCIL-COIC,
*Petitioner,*

*v.*

Tyrel ALBERT,
*Respondent.*

Workers' Compensation Board
1006937, 1006819; A150222

320 P3d 614

David L. Johnstone and MacColl Busch Sato, P.C., filed the briefs for petitioner.

Philip H. Garrow and Edward J. Harri, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Under the Oregon Workers' Compensation Law, a worker who suffers permanent disabilities in association with a compensable work-related injury will be entitled to a permanent partial disability (PPD) benefit if certain requirements are met. If the worker has returned to regular work at the job held at the time of injury or has been released to that work, then "the award shall be for impairment only," which is defined as "the loss of use or function of a body part or system * * * expressed as a percentage of the whole person." ORS 656.214(1)(a), (2)(a). Conversely, if the worker has not returned to regular work and has not been released to that work, then "the award shall be for impairment and work disability." ORS 656.214(2)(b). "'Work disability' means impairment modified by age, education and adaptability to perform a given job." ORS 656.214(1)(e).

This case involves a dispute over whether claimant had been released to regular work at the time his PPD benefit was determined and, therefore, whether he was entitled to work disability as part of that benefit. The Workers' Compensation Board (1) ruled that claimant was entitled to work disability and (2) penalized employer under ORS 656.268(5)(e) in association with its failure to include work disability in claimant's PPD benefit. Employer seeks judicial review, challenging both aspects of the board's order. As explained below, we conclude that the board erred in analyzing claimant's entitlement to work disability, and we remand the case to the board for reconsideration of that point. In light of that remand, we need not address employer's argument that the board erred by penalizing employer for not having included work disability in claimant's PPD award.[1]

The historical facts are not contested in any respect that is pertinent to our analysis. Claimant worked for employer as a "crew member" whose duties included clearing

---

[1] If the board again determines, on remand, that employer should have awarded work disability to claimant, it then can reconsider whether—given its new analysis of why claimant is entitled to that benefit—a penalty is warranted. If the board does so, it also should consider an additional argument that employer makes on judicial review: that, even if a penalty was justified, the board incorrectly calculated the penalty that it assessed in this case. In his brief to this court, claimant agrees that the board erred in calculating that penalty.

and building trails, building fences, and piling brush. In August 2009, claimant sustained a compensable injury to his knee. Employer accepted a claim for "dislocation, ACL tear, small tear medial meniscus, PCL tear, and Grade II strain, MCL." Claimant had two surgeries, the second of which was performed by Dr. Nonweiler in September 2009. He later participated in extensive physical therapy.

In November 2009, Nonweiler released claimant to a modified duty job, working four hours per day. The next month, Nonweiler approved claimant to perform sedentary work eight hours per day. That work was defined to include no lifting or carrying of objects weighing more than 10 pounds; claimant was to perform even lighter lifting or carrying only occasionally.

Nonweiler concluded in March 2010 that claimant was medically stationary and referred him for an evaluation of what Nonweiler projected would be "permanent impairment with respect to the knee." Later that month, an occupational therapist performed a "Physical Capacities Evaluation" (PCE) of claimant that was designed to "assess residual functional capacities since injury, specifically as this relates to return-to-work activities." After performing various tests, the therapist concluded that claimant could work "within the Light/Medium work range as defined by the U.S. Department of Labor." Among other details, the PCE report specified that claimant could frequently lift objects weighing up to 20 pounds and could occasionally lift and carry heavier objects weighing up to 45 pounds. The therapist specifically recommended against claimant lifting or carrying anything weighing more than 45 pounds, although she anticipated that he would be able to lift and carry up to 50 pounds within six months. The therapist also recommended some restrictions on the amount of time that claimant would spend standing and walking, noted that he could not squat using his right knee unless he was wearing a brace, and reported that he "was unable to demonstrate the ability to kneel and fully weight bear on the right knee." The therapist recommended that claimant "function within the parameters" described in the PCE report if he returned to work.

In April 2010, Nonweiler sent employer's insurer a form indicating that he concurred with every aspect of the PCE. Two months later, however, Nonweiler signed a "Regular Duty Job Analysis" form that had been prepared by employer. According to the instructions printed on the form, it was "intended to detail the physical requirements of the employee's regular job duties for review by the attending physician to determine whether the employee is able to return to the regular job." The form identified claimant's job as a "Crew Member" and described job duties that included "[t]rail maintenance, weed pulling, fence building, slash piling, campground maintenance." Specific physical tasks included frequent lifting of up to 20 pounds, occasional lifting of up to 50 pounds, and rare lifting of up to 75 pounds (defined as an event occurring one to five times per eight-hour work shift). The form also described claimant's job as involving frequent crouching and rare kneeling. Nonweiler's signature on the "Regular Duty Job Analysis" form apparently indicated to all parties that he agreed that claimant could perform the described job duties.

Employer subsequently issued a notice of closure in June 2010, awarding six percent "whole person" impairment for claimant's injured knee. The notice of closure stated that claimant had been released to regular work; indeed, the notice indicated that claimant had been released to his "[j]ob at injury without restrictions." Accordingly, the notice of closure did not include a work-disability award.

After employer issued the notice of closure, claimant requested reconsideration before the Appellate Review Unit (ARU) of the Workers' Compensation Division of the Department of Consumer and Business Services. During the ARU reconsideration process, claimant submitted an August 2010 "concurrence letter" that claimant's lawyer had sent to Nonweiler, the physician who performed claimant's second knee surgery. That letter pointed out the seeming inconsistency between Nonweiler's March 2010 concurrence with the PCE report, which recommended that claimant not lift or carry more than 45 pounds, and his signature on the June 2010 "Regular Duty Job Analysis" form, which described claimant's job as requiring some lifting

and carrying of weights up to 75 pounds. The lawyer's letter also described a purported inconsistency between the March 2010 concurrence and the June 2010 job-analysis form regarding the degree to which claimant could crouch or kneel. Claimant's lawyer asked Nonweiler whether, in light of those described inconsistencies, he still concurred with all aspects of the PCE findings.

The copy of the letter that was introduced in the ARU proceeding included Nonweiler's responses to the questions posed by claimant's lawyer. Nonweiler first indicated that he still concurred with all aspects of the PCE. Nonweiler also indicated that claimant was *not* released to regular work and, further, that claimant's injury had led to him being "significantly limited in the repetitive use of the right knee." Nonweiler's responses were dated August 29, 2010.

The ARU issued its order on reconsideration in November 2010. In that order, the ARU noted that the parties had been "asked to provide a detailed work history for the worker," which employer apparently had not provided. Accordingly, the ARU based its analysis on claimant's own description of his work history, the August 29, 2010, concurrence letter (including Nonweiler's responses), and the record developed at the time the claim was closed. The ARU determined that Nonweiler had "clarified," in the August concurrence letter, that claimant "was not released to regular work." Accordingly, the ARU concluded, claimant was entitled to work disability as part of his PPD benefit.

Having determined that claimant was entitled to work disability, the ARU's next task was to calculate that benefit, which is defined as the worker's whole-body impairment "modified by age, education and adaptability to perform a given job." ORS 656.214(1)(e). The method for performing that calculation is set out in Division 35 of the administrative rules of the Workers' Compensation Division, which describe, among other things, how the "age, education, and adaptability factors" are determined, resulting in a comprehensive "social-vocational factor" that is used to calculate work disability. OAR 436-035-0009(6) (describing how the

total PPD award is calculated when worker receives "both an impairment and work disability benefit"); OAR 436-035-0012 (describing calculation of the social-vocational factor). As pertinent here, the "adaptability factor" results from "comparison of the worker's base functional capacity (BFC) to [the worker's] maximum residual functional capacity (RFC)," per OAR 436-035-0012(7). The worker's base functional capacity, in turn, depends on his or her "demonstrated physical capacity before the date of injury or disease." OAR 436-035-0012(8). *See generally Trujillo v. Pacific Safety Supply*, 336 Or 349, 353 n 2, 84 P3d 119 (2004) (explaining calculation of work disability).

In its order on reconsideration, the ARU described how it determined claimant's adaptability factor in accordance with the administrative rules, based on its understanding of claimant's job at the time he was injured:

> "The record reveals that [claimant] was working at a heavy physical capacity position as a Forestry Worker (DOT 452.687-010) in the 5 years prior to date of injury. The record reveals that the worker is currently capable of medium Residual Functional Capacity (RFC) duties with restrictions."

Based on its determination that claimant's functional capacity had changed from "heavy" to "medium," as well as other pertinent factors, the ARU calculated a work-disability benefit for claimant, and assessed a 25-percent penalty against employer under ORS 656.268(5)(e) for having failed to include work disability in claimant's PPD award.

Employer sought a hearing before an administrative law judge (ALJ), challenging the ARU's determination that claimant was entitled to work disability. Employer asserted that Nonweiler's August 29 concurrence letter was unreliable and argued that, in the absence of that letter, "there is no evidence claimant is released other than to regular work." Employer also argued that, if the ALJ determined that claimant was entitled to work disability, employer should not be penalized for having failed to include that benefit in claimant's PPD award, as any such determination necessarily would be based on Nonweiler's August 29 letter, which issued after employer already had closed the claim.

The ALJ affirmed certain aspects of the ARU's order on reconsideration, but concluded that claimant had not met his burden of establishing that he was entitled to work disability; in particular, the ALJ found that Nonweiler had not persuasively explained what the ALJ deemed to be a "post-closure change of opinion regarding claimant's release for regular work." Accordingly, the ALJ reversed the ARU's work-disability award. In keeping with that determination, the ALJ also reversed the penalty against employer.

Claimant sought review before the board, raising issues related to the "extent of permanent disability (work disability) and penalties." In response, employer again argued that the ALJ had correctly ruled that claimant was not entitled to work disability because Nonweiler's August 29, 2010, concurrence letter—which stated that claimant was not released to regular work—"was not persuasive as it represented an unexplained change of opinion" and because, employer asserted, it was based on a mischaracterization of the PCE and the medical evidence.

The board reversed the ALJ's determination that claimant was not entitled to work disability. The board explained that claimant's entitlement to that benefit depended on whether his attending physician had released him to "regular work," that is, "the job the worker held at the time of injury." In that regard, the board determined that Nonweiler had not released claimant to regular work, notwithstanding his June 9, 2010, approval of the "Regular Duty Job Analysis." In explaining its reasoning, the board noted, among other things, that the ARU had "concluded that claimant was a 'forestry worker' (DOT 452.687-010) with a strength requirement of 'heavy,' which is defined as the ability to frequently lift 50 pounds and occasionally lift 100 pounds." The board expressed its agreement with the ARU on that point and, after further analysis, concluded that claimant had not been released to regular work. The board therefore awarded claimant work disability, concurring with the ARU's determination of the extent to which claimant was disabled. The board also agreed with the ARU's determination that employer's insurer should pay a 25-percent penalty under ORS 656.268(5)(e). In doing so, it

rejected the insurer's contention that it could not reasonably have understood, at the time of claim closure, that claimant had not been released to regular work. One board member dissented.

Employer seeks judicial review, raising three assignments of error. First, employer asserts that the board "erred as a matter of law in relying upon the Dictionary of Occupational Titles (DOT) Codes, instead of the regular duty job description provided by employer, in order to determine whether claimant was released to his regular work for purposes of evaluating his entitlement to a work disability award." Second, employer contends that the board erred in penalizing it under ORS 656.268(5)(e). Third, employer argues that the board incorrectly calculated that penalty. As noted, we address only the first of those arguments, as it is dispositive. In doing so, "[w]e review the board's decision for substantial evidence and errors of law, and to determine whether the board's analysis comports with substantial reason." *SAIF v. Ramos*, 252 Or App 361, 363, 287 P3d 1220 (2012).

Employer contends that the board committed legal error by relying on DOT occupational-title codes in determining whether claimant had been released to his regular work. According to employer, those codes are relevant "solely to ratings of impairment and work disability for purposes of calculating 'the social-vocational factor ***'"—the purpose for which the ARU cited the DOT "Forestry Worker" code early in this case—and are not relevant "to determination of whether an injured worker has been released to his job at injury, especially when the employer has provided a specific job analysis for the job at injury." Instead of relying on the DOT code, employer argues, the board should have analyzed whether claimant had been released to his regular work based on employer's description of that work in the "Regular Duty Job Analysis," that is, on evidence in the record.

In response, claimant argues that the board properly evaluated "the total record," including the DOT codes, which claimant describes as providing "an objective evaluation of thousands of jobs nation-wide." According to claimant, the precision reflected in those codes is useful not only

for determining the social-vocational factor on which a work-disability calculation is based, but also in answering the predicate question of whether a disabled worker is entitled to *any* award of work disability.

The parties' arguments reflect some disagreement about the purpose for which the board cited the DOT "Forestry Worker" code in its order. Employer's argument reduces to a contention that the board relied on the code *instead* of on evidence regarding claimant's actual work. Claimant, on the other hand, appears to argue that the board was entitled to rely on the code as evidence of claimant's actual job duties.

Accordingly, we begin by considering what use the board made of the DOT code. We quote the portion of the board's order that reflects its determination that claimant had not been released to his regular work, *i.e.*, "the job [he] held at injury," ORS 656.214(1)(d):

> "Claimant's 'at injury' job was as a 'crew member.' Assigned to the U.S. Forestry Services, claimant performed duties such as making/maintaining trails, building fences, clearing brush and maintaining campgrounds. *The [ARU] concluded that claimant was a 'forestry worker' (DOT 452.687-010)* with a strength requirement of 'heavy,' which is defined as the ability to frequently lift 50 pounds and occasionally lift 100 pounds. We agree with the ARU's assessment.

> "According to the PCE with which Dr. Nonweiler concurred, claimant is only capable of performing light/medium work. After the PCE was performed, the employer sent Dr. Nonweiler a job analysis. *It was entitled a 'Regular Duty Job Analysis,' which listed the physical requirements of claimant's job* as including frequent lifting to 20 pounds, occasional lifting up to 50 pounds and rare lifting to 75 pounds. Dr. Nonweiler approved the job analysis, even though the physical requirements exceeded the PCE limitations. However, the physical requirements of the regular job analysis would not fall in the 'heavy' range that characterized claimant's 'at injury' job. Therefore, Dr. Nonweiler's approval of the regular duty job analysis would not constitute a release to regular work.

> "Claimant's attorney subsequently requested clarification from Dr. Nonweiler regarding claimant's work status.

In response, Dr. Nonweiler indicated that [claimant] was not released to regular work.

"Accordingly, having reviewed this record, we find that claimant has not been released to regular work. Therefore, he is entitled to work disability."

(Footnote and citations omitted; emphases added.)

Thus, in determining whether claimant had been released to his regular work, the board relied on two descriptions of claimant's work for employer: (1) the employer's "Regular Duty Job Analysis"; and (2) the ARU's determination that claimant "was working at a heavy physical capacity position as a Forestry Worker (DOT 452.687-010)" before he was injured. The board then performed two comparisons. First, it compared claimant's post-injury capacity, as described in the PCE with which Nonweiler concurred, to the Regular Duty Job Analysis. The board determined from that comparison that the duties described by employer in the Regular Duty Job Analysis "exceeded the PCE limitations." But the board did not rely solely on that comparison in determining that claimant had not been released to his regular work. Nor did it base its conclusion solely on Nonweiler's later clarification, in the August 2010 concurrence letter, that he still agreed with all aspects of the PCE.

Instead, the board also made a second comparison, this time between the duties described in the Regular Duty Job Analysis and what the board characterized as "the 'heavy' range that characterized claimant's 'at injury' job," *i.e.*, the job as outlined in the DOT code for Forestry Worker. Having determined that the job duties described by employer "would not fall in the 'heavy' range" as the Forestry Worker job was described in relation to the DOT code, the board concluded that even Nonweiler's signature on the Regular Duty Job Analysis would not constitute a release to regular work.

The difficulty with that latter part of the board's analysis is that it conflates two distinct concepts: (1) determination of *whether* a worker has not returned to or been released to regular work and, therefore, is entitled to work disability; and (2) if the worker is entitled to work disability, how that benefit is calculated. The ARU cited the DOT

Forestry Worker code only for the latter purpose. That is, *after* having determined the nature of claimant's regular work based on evidence in the record (including claimant's own description of his work history and Nonweiler's responses in the August 2010 concurrence letter), and *after* having determined that claimant was entitled to work disability because he had not been released to that pre-injury work, the ARU *then* looked to the DOT code to establish what job classification most accurately described claimant's base functional capacity before he was injured, as OAR 436-035-0012 contemplates.

Thus, the ARU's purpose for citing the DOT Forestry Worker code was very narrow; it determined only how claimant's base functional capacity would best be characterized on a nine-point scale ranging from "sedentary restricted" to "very heavy" for the purpose of determining the social-vocational factor upon which claimant's work-disability benefit would partly be based. OAR 436-035-0012(8). Nothing in the ARU's order on reconsideration indicates that the ARU believed that the DOT code provided evidence regarding the actual nature of claimant's job duties. Rather, the ARU appears to have chosen that code based on its determination of which DOT job classification most accurately reflected the general nature of claimant's job duties, as those duties were established by actual evidence in therecord. Likewise, in their briefs to the ALJ and the board, the parties cited the DOT code solely with respect to how the amount of any work-disability benefit should be calculated, and not in relation to the predicate question, that is, whether claimant had been released to his at-injury job and therefore was not entitled to any work disability at all. The board's order appears to be the first time, in this case, that the DOT code was used as support for answering that predicate question.

Given the circumstances outlined above, we agree with employer that the board erred in basing its determination that claimant had not been released to his regular work in part on the ARU's reference to the DOT Forestry Worker code. The ARU's choice of that code for purposes of calculating the amount of claimant's work-disability benefit is not *evidence* of claimant's actual job duties before he was injured. Rather, it reflects only a *conclusion* based on

the evidence on that point, a conclusion required by the need to fit claimant's regular work into one of nine categories describing the overall level of physical activity associated with the job, for purposes of identifying claimant's base functional capacity. Instead of relying on the ARU's conclusion about which DOT code best reflected claimant's pre-injury physical capacity, the board should have determined whether claimant had been released to his at-injury job based on evidence in the record, which includes medical records describing the work that claimant was performing when he was injured, claimant's own description of his work history, employer's Regular Duty Job Analysis, and the evidence about claimant's post-injury capacity. We remand for the board to perform that determination.[2]

Reversed and remanded.

---

[2] We do not hold that DOT codes never could be helpful in assessing whether a worker has been released to his or her regular work. To the contrary, we acknowledge the possibility that, in a particular case, a party's or factfinder's identification of a particular DOT code as reflecting a worker's job duties could be based on historical facts not otherwise reflected in the record of the case. In such circumstances, the choice of DOT code arguably could itself serve as evidence of the worker's actual job duties. Here, however, nothing suggests that the ARU based its choice of DOT code on anything other than the same documentary evidence that made its way into the record before the ALJ and the board. Accordingly, the ARU's choice of the Forestry Worker code adds nothing to the evidence about the nature of claimant's job duties.